UNITED STATES, Appellee,

v.

**Joseph L. DEAN, Staff Sergeant, U.S. Air Force, Appellant.**

No. 61,376.
ACM 26786.

U.S. Court of Military Appeals.

Argued Dec. 13, 1989.
Decided Sept. 26, 1990.

For Appellant: *Major Ronald G. Morgan* (argued); *Colonel Richard F. O'Hair* (on brief); *Major Frank J. Spinner.*

For Appellee: *Captain Leonard R. Rippey* (argued); *Colonel Joe R. Lamport* and *Major Terry M. Petrie* (on brief); *Colonel Robert E. Giovagnoni.*

*Opinion of the Court*

EVERETT, Chief Judge:

Appellant was tried at Seymour–Johnson Air Force Base, North Carolina, by a general court-martial composed of officer members. The charges were that, "on divers occasions between on or about 10 September 1985 and on or about 1 May 1987," he had raped and committed sodomy with his daughter Jessica, in violation of Articles 120 and 125, Uniform Code of Military Justice, 10 USC §§ 920 and 925, respectively.

After a hotly contested trial, the court-martial found him guilty as charged and sentenced him to a dishonorable discharge, 7 years' confinement, and reduction to the grade of E–1.

The convening authority approved the sentence; and the Court of Military Review affirmed the findings and sentence in a short-form opinion. After Dean petitioned this Court for review, we remanded the case to the Court of Military Review for consideration of admissibility of testimony by two government witnesses about statements of the alleged victim. 28 MJ 170 (1989). Upon further review, the court below concluded that the hearsay statements in question were admissible under Mil.R. Evid. 803(4), Manual for Courts–Martial, United States, 1984, and reaffirmed appellant's conviction and sentence. 28 MJ 741 (1989). In light of this adverse decision, appellant again sought review from this Court; and we granted this issue for review:

WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR BY OVERRULING THE DEFENSE OBJECTION, BASED ON MIL.R.EVID. 803(4), TO THE TESTIMONY GIVEN BY TWO GOVERNMENT WITNESSES, NANCY L. BERSON AND NANCY R.F. MILLER.

I

At a pretrial session, defense counsel questioned admissibility of intended testimony by Ms. Nancy Berson and Ms. Nancy Miller about statements made to them at various times by Jessica, who was then 6–years–old. To establish admissibility of these statements, the Government first called Ms. Marcia Herman–Giddens, Director of the Child Protection Team at the Duke University Medical Center in Durham, North Carolina. This witness testified that she held a Master's Degree in Public Health from the University of North Carolina and was board-certified as a physician's assistant. She had been involved with "around a thousand" cases of child sexual abuse. She had examined hundreds of children ranging in age "from infants up to age 18."

On May 12, 1987, she had examined Jessica at the request of Dr. Nan Friedman, an endocrinologist who was seeing this patient. She performed "[a] general physical examination and then a careful genital and anal examination." Ms. Herman–Giddens "found Jessica to have an abnormal anal examination." In explaining photographs taken of Jessica's private areas, she testified that the girl had "virtually no hymenal tissue remaining" and had very noticeable "redness ... around the vaginal opening" and "some clear vaginal discharge." Also, she found evidence of an old laceration at the opening of the vagina.

Ms. Nancy Berson, Coordinator of the Child Protection Team at the Duke University Medical Center, testified that she was "the primary interviewer for purposes of ... medical diagnoses of cases where we suspect child abuse or child sexual abuse." On May 12, 1987, Marcia Herman–Giddens had stated to her that Dr. Friedman "was concerned that there was a child at our clinic whose exam appeared to be abnormal, and it was felt that she needed an interview to assess her sexual abuse." After some discussion with the child's mother, Ms. Theresa Dean, and with Ms. Herman–Giddens, "it was decided that the child should be admitted for a more thorough evaluation of all of her medical problems and that the interviews would proceed during the admission."

According to Ms. Berson, since she had been at Duke, she had interviewed "approximately 450 to 500 children ... for purposes of medical diagnoses of child sexual abuse. More specifically, in the last year, I have seen approximately 175 to 200." As a result of "a group decision," Dr. Friedman, the endocrinologist who originally had made the referral, arranged for Jessica's admission as an inpatient at Duke. Although Ms. Berson spoke with Jessica briefly on the afternoon of May 12 to make her feel at ease, the first interview was on May 13. When she asked Jessica "if she understood why she was admitted,"

Ms. Berson received a negative response. Thereupon, without going into detail, she "explain[ed] to Jessica what my role would be during her admission at the hospital," telling her "that I was a lady who talked with kids in the hospital when we were concerned that things might be bothering them or worrying them."

She also interviewed Jessica on May 14. At that time, when she asked the girl if she remembered the conversation of the previous afternoon, Jessica replied—"something to the effect that, 'mommy doesn't .... said if I talk, I'll be punished,' 'I can't talk.' Then I asked her, 'How?' And she said, 'I'll get a whipping.'" Ms. Berson testified that "the approach we use at Duke is that to make an adequate diagnosis of child sexual abuse, one of the more important parts of that diagnosis is the child's disclosure and the details and the information the child can tell you about the child sexual abuse." From her interviews with Jessica, Ms. Berson concluded that the girl had been "sexually abused ... and that it should be reported to the Department of Social Services."

When asked by the military judge why she had questioned Jessica "as to who was involved" in the sexual abuse, Ms. Berson replied that

one of the main focuses in terms of therapy that we seek, for knowing "who," is that again, you can't treat the child if the abuse is on-going. So, that if you don't know who it is and the person is continuing to sexually abuse the child, then your therapy is not going to be very productive because the child will see no benefit in talking about what happened because they're going to continue to be victimized. The issue again, is the child's safety, and that it stop.

When Ms. Berson had concluded her testimony, the military judge stated:

Based on the presentation of Ms Berson, I will sustain an objection under 803(4), if this is all that I am going to get.

He explained:

[T]he issue under 803(4) is not the purposes of the individual taking the information. That is not the only issue. The other issue is the purposes of the person giving the information. As of right now, I have no information that would indicate that Jessica had any distress, was there in a hospital for the purposes of obtaining help. And based on that, 803(4) will not apply. This then brings us to the alternative theories unless as I say, there is some other information; and that will take some time. I've been through this before under the Residual Hearsay Rules.

In response, trial counsel indicated that she was still planning to proceed under Mil.R. Evid. 803(4) with respect to Jessica's statements to Ms. Berson and to another witness, Ms. Miller.

Ms. Nancy Miller, a staff psychologist at the Wayne County Mental Health Center,[1] then testified for the Government.[2] As part of her duties, she "routinely interview[ed] ... suspected victims of child sexual abuse"; and she had spoken with Jessica Dean on September 3, 4, and 8, 1987. When asked by trial counsel, "What questions did Jessica ask you that made it clear to you that she knew why she was there?" Ms. Berson responded:

She asked me does this happen .... a direct quote—she asked me if it happens to black children too. And I told her it did and I added that it happens to boys too. She was ... she right away was upset that her parents may go to jail. She brought that out right away. And I said, "sometimes things like this happen." And she was afraid that she would go to a different home, so I was attempting to maybe alleviate some of

---

1. Wayne County, North Carolina, is the county in which Seymour–Johnson Air Force Base is located.

2. Previously, the defense had moved unsuccessfully to exclude any testimony by Ms. Miller

because she was the wife of the Special Agent in charge of the Office of Special Investigations (OSI) Detachment at Seymour–Johnson Air Force Base, which had participated in investigating the charges against appellant.

these initial fears. She was just very anxious and fearful. I think she was concerned about consequences. She was real worried about her family.

According to Ms. Miller, during these interviews Jessica "was scared of things that had happened to her; that she was sad, mad." Ms. Miller testified that it was important to identify the abuser,

> because it will change treatment if it's inter-familial, or outside the family, it's a major change in treatment.... And my therapy is different because of the roles that are involved in a family dynamic versus a stranger in an alley.

After evaluating Jessica in September 1987, Ms. Miller had become her therapist. In that capacity she had attempted "to prepare the child for the emotional trauma" of testifying in court. This included role playing in "a mock courtroom setting." However, it had not been her "purpose" to prepare Jessica "to testify against her father in order that her father be sent to prison."

In connection with Ms. Miller's preparing Jessica for court, defense counsel questioned Ms. Miller about a juvenile court order entered in the Wayne County District Court whereunder Ms. Dean had been ordered not to discuss certain topics with the child. Ms. Miller responded that she had "had nothing to do with that court order" and that it had not been directed to her.

As part of her "therapy," she had explained to Ms. Dean "what happened to another mother" who had covered up for her husband. When she saw Jessica on September 3, she did not know who had set up the appointment which led to her interview with the child or whether the child and mother had been ordered to be there. However, when Ms. Miller "ended ... [her] first interview with Jessica" on September 3 and talked with the child "about coming back the next day," she "wanted to come back—was eager."

In response to a question from the military judge as to why she "felt that the state order to the mother was probably a good idea," she replied:

Because after the panic phase, ... that this has been disclosed that it's come up, and society is involved with something, then there becomes a strong suppression phase, that they try to ... family members try to suppress the child to be quiet because of the losses that can occur, and it's like ... it could be verbal or it could be you know ... covert ... overt ... any kind of suppression that's going on for the child to be quiet. The child's put in a real ... it's a real bind there because she wants the abuse to stop and yet she feels she still has to protect her family.

On September 3, when she initially saw Jessica, Ms. Miller had

> said that some things may have happened that you feel sad or that—you know, I'm here to help you. I'm here ... this is my job ... my special job. I'm lucky. I get to work with special children like you. And that's when she had asked me if this happened to black children, and that kind of thing. And I said, "Yes, it does."

The witness then added that

> she went on to mention, I think about her weight, and that she was conscious about her weight and she had mentioned, I think why she went to Duke, the hospital and you know, I said, "well, you know I have that problem too." "And sometimes when we're unhappy, we may overeat." That came up.

On cross-examination, Ms. Miller conceded that she had assumed that Jessica "had special problems" because of "the nature of the case referred to" her.

When Ms. Miller had concluded her testimony, the military judge asked trial counsel and the defense if they wanted to offer any further evidence as to admissibility under Mil.R.Evid. 803(4) of statements made by Jessica to Ms. Berson and Ms. Miller. Their response was in the negative. Thereupon, the judge said that he needed to inquire about the order entered by the juvenile court. This prompted Dean's civilian defense counsel to complain that it was inappropriate for Ms. Miller to be prepar-

ing the child to testify while, at the same time, the mother was precluded by court order from even talking to her daughter about the case.

The judge had reviewed various documents that are in Dean's record of trial as appellate exhibits. Among these was a court order entered in the State District Court by consent on August 25, 1987, and entitled *In the matter of: Jessica Dean.* This order provided that, until a later hearing, Sergeant Dean "shall not be in the presence of the juvenile, Jessica Dean, unless there is another adult also with him and her"; and it required "the mother, Theresa Dean," to "secure the" child's "medical records ... from Seymour–Johnson Air Force Base and ... take them" to Dr. David Tayloe for use in examining the child. Also, Ms. Dean was required to "cooperate with the Wayne County Department of Social Services in setting up an appointment for Jessica Dean with Dr. Tayloe"; and the Department of Social Services was to "transmit a copy of the [Duke] medical records" to this physician.

A later consent order had been entered by the same court on November 23, 2987— this being the order to which civilian defense counsel apparently had been referring in his cross-examination of Ms. Miller. It provided "[t]hat Joseph L. Dean have absolutely no contact with Jessica Dean" and "[t]hat no one shall make statements to Jessica Dean that she, Jessica Dean, is responsible for any of the problems or problems currently facing the family." Also, it required "[t]hat Jessica ... continue in therapy with the therapist at the Wayne County Mental Health Center who is presently treating her"; that Ms. Dean "undergo therapy with the therapist of her choice"; and "when both the therapist for Theresa Dean and the therapist for Jessica Dean agree that joint therapy should be utilized: Theresa Dean and Jessica Dean shall undergo joint therapy." Moreover, if these "conditions were not met, the Department of Social Services" was authorized to "petition for a hearing on removal of the child."

When he had completed his review of the court orders, the military judge asked if the parties had submitted all the evidence they wished on the issue of admissibility under Mil.R.Evid. 803(4). The Government answered in the affirmative; but the civilian defense counsel decided to call Mrs. Dean as a witness.

She testified that she had not of her "own volition" initiated treatment of Jessica with the Wayne County Mental Health Center but that she had been sent there for an evaluation of Jessica by Dr. Jonathan Barnes. No one at Duke had discussed her taking Jessica to the Mental Health Center for treatment. When she went there with Jessica and talked with Ms. Miller, she "was told that if I discussed court or anything to do with this that Jessica would be removed from my home and put in a Foster Home."

In recent weeks before trial, Ms. Miller had reiterated that Ms. Dean should not "discuss court with" Jessica. However, Ms. Miller had told her that she and Jessica "had practiced court." According to Ms. Dean, when she first went to Duke, it was because of Jessica's weight and not to have her examined for sexual abuse. Moreover, it was not her "desire to take Jessica to" the Mental Health Center because of "some idea she may have been sexually abused." Ms. Miller had told Ms. Dean that she thought Ms. Dean was covering up for her husband; and she had given an example "about a mother who had went to jail for six months because she had seen it and not said anything."

On cross-examination, Mrs. Dean repeated her direct testimony that she had taken Jessica to the Mental Health Center for evaluation at the initiative of Mr. John Duke, who was the "juvenile attorney" for her and Jessica. She did not know why he had recommended this. When asked if she had talked "with Jessica explaining to her why she was going down to mental health, if this was to help her out, and that Mr. Duke wanted us to do this," Ms. Dean responded, "Yes, I've told her that Nancy Miller is here to help us." She had "en-

courage[d]" her "daughter to speak openly with Ms. Miller because she was there to help her"; and "I've always asked Jessica to tell the truth."

When she had taken Jessica to the Duke Medical Center, it was for her daughter's "obesity problem"; and she had not "anticipat[ed] that Jessica was going to be admitted into the hospital." This was not the first time that Jessica had been an inpatient in a hospital; and "once she found out that they were going to keep her there for a couple of days, ... [s]he wasn't afraid." Mrs. Dean had told Jessica "to cooperate with the doctors during testing." She was "sure" that "Jessica understood that she was in a hospital"; but, as to whether "she understood that she was there to get some type of treatment," Mrs. Dean could not "give a yes or no answer." Jessica at first "was afraid of Nancy Berson. We had to coax her to go with her." Mrs. Dean told Jessica that "she had to" speak to Ms. Berson; "the lady was going to try and help her."

In response to questions by the military judge, Mrs. Dean testified that Jessica's weight problem had persisted since she was 3; and Mrs. Dean mentioned various medical consultations about the problem. "I've had her to about five different doctors." As to the military judge's question whether Jessica "underst[oo]d that she had problems with her weight," Mrs. Dean responded, "I don't think she understands. She knows she's fatter than other kids and other.kids make fun of her. I don't think ... that she knows she's got a weight problem, but she knows she's bigger."

After Mrs. Dean's testimony, the judge heard argument as to whether Jessica's statements to Ms. Berson and Ms. Miller that she had been sexually abused by her father were admissible under Mil.R.Evid. 803(4). In deciding to receive the evidence, the judge stated:

Under this particular hearsay exception, I'm looking to see if there are, in essence, two requirements met. First, is a subjective test, and that is whether the speaker of the information, in this case,

Jessica Dean, perceives that the situation is one that will promote her well being and thus would have an incentive to be truthful. Thus, the key initial question is Jessica Dean's state of mind. She need not know the exact medical purposes for which the information is being requested, nor does she need to know with any medical precision that something is specially wrong. As to this first requirement, I find that in both interviews with Ms Berson and Ms Miller, that Jessica Dean's state of mind was that these sessions were set up to help her. Ms Dean had specifically advised her daughter of this and Jessica Dean was aware that she could use help for her weight and that she was sad and scared about what had happened to her. Now, the second, and more objective requirement is that the specific information offered must be to quote from the rule, "reasonably pertinent to the diagnosis or treatment." I find that this objective test also to have been met. The law specifically provides that information for the purposes of psychiatric treatment is included within this exception. Further, persons in the medical capacity, such as Ms Berson and Ms Miller, fit within the rule of persons covered by this rule. Not just doctors are included. Both Ms Berson and Ms Miller quite clearly and logically explained the importance of knowing for treatment purposes, the "what" and "who" of this circumstance. Information not only is reasonably pertinent, but actually required for effective treatment. The fact that both Ms Berson and Ms Miller may have had other concerns than medical treatment, does not, in this case, abrogate the finding of medical pertinence. Now, I would note that I am familiar with the nature of the testimony to be offered under this exception not only by that already received in testimony from the two witnesses, but also from the matters that are contained in Appellate Exhibit I, et cetera, that I was required to review prior to trial. Now on other issues mentioned by the defense, contrary to the argument to

counsel, that rule 803(4) contemplates this testimony being used only after Jessica Dean testifies, the rule sets no such requirements. Unless you're trying to raise some other issue and I have misheard you.

Subsequently, the court-martial members were assembled and the trial began. The Government offered extensive medical evidence; and through Ms. Berson and Ms. Miller, it presented testimony about Jessica's statements concerning abuse by her father. Appellant, his wife, and two daughters who lived with them in their home all testified that Sergeant Dean was a loving father and had never abused Jessica. The defense offered numerous witnesses as to appellant's good character; and it called a medical expert to testify. Also, the defense offered a videotaped interview of Jessica, which had been conducted on May 18 by Mary Macri, a social worker at the Wayne County Department of Social Services. This was apparently the only videotape that had been made of numerous interviews with Jessica and was offered to show that, by suggestive questions, interviewers had implanted in Jessica's mind that she had been sexually abused by her father.[3]

There was evidence in rebuttal and surrebuttal. Moreover, the court members were exceptionally attentive during the trial; and they not only asked questions of many witnesses but also requested that a doctor be called to testify who had treated Jessica several years before for injury in the vaginal area. At no time was Jessica called as a witness by either side—although she had testified at the Article 32, UCMJ, 10 USC § 832, pretrial hearing. The court members deliberated at great length before finally returning the findings of guilty.

## II

Frequently, the child victim of alleged sexual abuse is uncooperative with prosecutors and recants earlier statements about being abused. Often there is concern that a child may be subjected to severe emotional trauma if called to testify in court—especially if the defendant is a close relative.

Consequently, prosecutors have searched for alternatives to having the child testify against the accused face-to-face in the courtroom. For example, many states allow use under certain circumstances of closed-circuit television for receipt of testimony by child witnesses in child-abuse cases. *See, e.g., Maryland v. Craig,* 497 U.S. ——, 110 S.Ct. 3157, 3168, 111 L.Ed.2d 666 (1990). In other instances, prosecutors will seek to introduce a child's extrajudicial statements—to a doctor, investigator, a teacher, a parent, a social worker, or some other person. *See, e.g., Idaho v. Wright,* 497 U.S. ——, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); *United States v. LeMere,* 22 MJ 61 (CMA 1986); *United States v. Deland,* 22 MJ 70 (CMA), *cert. denied,* 479 U.S. 856, 107 S.Ct. 196, 93 L.Ed.2d 128 (1986); *United States v. Arnold,* 25 MJ 129 (CMA 1987), *cert. denied,* 484 U.S. 1060, 108 S.Ct. 1015, 98 L.Ed.2d 980 (1988); *United States v. Martindale,* 30 MJ 172 (CMA 1990), *reconsideration granted* and record remanded, 32 MJ 33 (Daily Journal September 19, 1990). When such evidence is offered, the courts are confronted with hearsay objections and claims that a defendant's right to confrontation has been infringed.

In *Idaho v. Wright, supra,* the Supreme Court commented that the case before it did

> not raise the question whether, before a child's out-of-court statements are admitted, the Confrontation Clause requires the prosecution to show that a child witness is unavailable at trial—and, if so, what that showing requires. The trial court in this case found that respondent's younger daughter was incapable of communicating with the jury, and defense counsel agreed. The court below neither questioned this finding nor discussed the general requirement of unavailability.

---

**3.** At the Duke University Medical Center, the policy is not to videotape interviews with children who may have been sexually abused. Apparently, this policy is based on concerns by the University Counsel about possible uses of such videotapes.

For purposes of deciding this case, we assume without deciding that, to the extent the unavailability requirement applies in this case, the younger daughter was an unavailable witness within the meaning of the Confrontation Clause.

110 S.Ct. at 3147 (citation omitted).

■ In the present case, the Government relied on Mil.R.Evid. 803(4) in its introduction of Jessica's statements to Ms. Berson and Ms. Miller. Mil.R.Evid. 803 does not require the prosecutor to establish the declarant's unavailability.

The defense at no point invoked the Confrontation Clause, and it did not specifically claim that the prosecution must establish unavailability to testify. If the defense had wished to make an issue of Jessica's availability, it had several opportunities—and at least one invitation—to do so.[4]

Indeed, it seems quite likely that Jessica could have been called to testify. She had testified at the Article 32 pretrial hearing;[5] and there is no reason to believe that she had left the area. Apparently, both the prosecution and the defense decided that the child's testimony in court would not help their respective causes. The prosecution presumably concluded that her pretrial statements to Ms. Berson and Ms. Miller were at least as effective as her in-court testimony would be. The defense probably was concerned about what Jessica might say if cross-examined about her pretrial statements.

At one point during presentation of the defense case, the military judge reminded counsel that they had not yet resolved a question raised earlier as to Jessica's competence to testify. Thereupon, the civilian defense counsel replied, "[A]t this time, after ... I guess this is on the record. We have decided at this time not to call Jessica."[6]

Under these circumstances, we need only consider whether Jessica's statements to Ms. Berson and Ms. Miller met the requirements of Mil.R.Evid. 803(4) without reference to appellant's right of confrontation. Clearly, the military judge was well aware of the requirements of that rule. Thus, the only issue is whether the evidence supported his rulings.

■ The statements to Ms. Berson are the easier to deal with. Even though Jessica had not come to the Duke University Medical Center to be examined for sexual abuse, this examination was certainly for a valid medical purpose; and the interview by Ms. Berson—conducted as a part of a team effort—is within the scope of Mil.R. Evid. 803(4). Furthermore, for reasons explained by Ms. Berson, it was important for her to ascertain not only whether sexual abuse had occurred but also who the perpetrator was.[7]

The issue, as the military judge perceived from the outset, was whether Jessica believed that she was receiving treatment that would help her, so that it was important for her to give truthful information to Ms. Berson. Jessica had a weight problem for which she had been examined by several doctors and for which she had been brought to Duke by her mother; she had been in hospitals numerous times before as an inpatient; and she had been admitted at Duke as an inpatient. Under these circumstances, we believe the military judge could reasonably decide that Jessica expected to

---

4. As we interpret the previously quoted judge's comment in ruling that Mil.R.Evid. 803(4) did not require Jessica to testify before her statement was admitted, he was making clear that he did not believe that the defense had attempted to raise any issue concerning availability of this witness.

5. Neither side attempted to introduce the testimony that Jessica had given at the Article 32 hearing.

6. The court members, who did request the presence of one witness not called by the parties, presumably concluded that, if neither the Government nor the defense had called Jessica, it was not worth their while—or the trauma to Jessica—to have her testify.

7. Ms. Miller's testimony is to the same effect with respect to her inquiry about the identity of the abuser. For similar testimony in another case, *see United States v. Deland*, 22 MJ 70, 74 (CMA), *cert. denied*, 479 U.S. 856, 107 S.Ct. 196, 93 L.Ed.2d 128 (1986).

benefit from giving truthful answers to Ms. Berson.

■ Jessica's statements to Ms. Miller also can be considered for purposes of medical diagnosis and treatment. However, in this instance, it is less clear that the girl perceived a prospective benefit from being truthful in her answers.

The interviews with Ms. Miller were not in a hospital context. According to Ms. Miller's testimony, Jessica had been originally seen on September 4, 1987, by Dr. Jonathan Barnes, to whom she had been referred for a mental health evaluation. He had been unable to establish a rapport with Jessica and had asked Ms. Miller to assist him in interviewing the child. We note, however, that Ms. Dean testified that she had told Jessica that Ms. Miller was "here to help us" and that she should "speak openly with" her. Taking this into account and the events that had preceded, we conclude that the statements to Ms. Miller are included—although narrowly— within the rationale of Mil.R.Evid. 803(4).

■ We also are of the view that—even though it was a close, hotly contested case—any error in admitting the testimony of Ms. Miller was not prejudicial. The defense had already introduced into evidence the videotape of Ms. Macri's interview of Jessica on May 18, 1987. In light of that interview and others, we believe the court members would have inferred that by September Jessica already had been interviewed so often—occasionally in a rather suggestive manner—that whatever she told Ms. Miller at the time should be given little

weight. On the other hand, the statements that she had made to Ms. Berson on May 13—when for the first time she was interviewed about suspected sexual abuse— would have been given great weight by the members.

In conclusion, we must acknowledge once again that cases like this give us great concern. As Justice Scalia pointed out in his dissent in *Craig*, there are studies which "show that children are substantially more vulnerable to suggestion than adults, and often unable to separate recollected fantasy (or suggestion) from reality." 110 S.Ct. at 3175. Moreover, as he recites, there have been tragic instances of false accusations of sexual molestation. *Id.* Therefore, both trial and appellate courts must be vigilant in assuring that the rights of the accused are preserved.

Here, the military judge displayed that vigilance. Moreover, there is extensive medical testimony to establish appellant's guilt—although the defense offered expert testimony to show that Jessica's medical abnormalities in the genital and anal areas were consistent with causes other than sexual abuse. Our ultimate conclusion—"the bottom line"—is that Dean received a fair, well-conducted trial and that no prejudicial error tainted his conviction.

### III

The decision of the United States Air Force Court of Military Review is affirmed.

Judges COX and SULLIVAN concur.