UNITED STATES

v.

Tyrone MILLER, 429 13 4853, Staff Sergeant (E–6), U.S. Marine Corps.

NMCM 89 2570.

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 15 Feb. 1989.

Decided 15 Feb. 1991.

LT Tamara A. Massengale, JAGC, USNR, Appellate Defense Counsel.

LT L. Lynn Jowers, JAGC, USN, Appellate Government Counsel.

CDR Glenn R. Kessel, JAGC, USNR–R, Appellate Government Counsel.

Before WILLEVER, STRICKLAND and ORR, JJ.

ORR, Judge:

Contrary to his pleas before a military judge sitting alone as a general court-martial, the appellant was found guilty of one specification of raping his 12-year-old daughter on 6 October 1988, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920; one specification of committing sodomy with his daughter during 1988, in violation of Article 125, UCMJ, 10 U.S.C. § 925; and one specification of committing indecent acts upon his daughter during 1988, in violation of Article 134, UCMJ, 10 U.S.C. § 934. He was sentenced on 15 February 1989 to be confined for eight years, to forfeit $350.00 of his pay per month for 96 months, to be reduced to pay grade E-1, and to be separated from the U.S. Marine Corps with a dishonorable discharge.

Although the military judge recommended that all confinement in excess of five years be suspended if the appellant participated in a rehabilitation program, the convening authority initially approved the sentence adjudged. In a supplementary action, however, the convening authority suspended all unexecuted confinement as of 30 May 1990 for a period of four years from that date on the condition that the appellant proceed immediately to his intended out-of-state destination in the State of Arkansas without making any physical contact with his wife or daughter and that, during the period of the suspension, the appellant refrain from physically contacting his wife or daughter unless the contact is supervised under an appropriate State-certified and licensed family counseling program. The supplementary action and order includes a more precise definition of the term, "physical contact".

I

■ The evidence offered by the Government at trial included the appellant's oral statement to a Naval Investigative Service (NIS) agent in which he stated: "I admit that I have done sexual things to my daughter, but there's not a living soul on earth that I will give the details to." Record at 38. The appellant subsequently admitted as part of that same NIS interview that he had had sexual intercourse with his daughter on the previous night,

but he denied any type of sodomy or fondling. Record at 44–45. The Government also offered statements by the appellant to a social worker (Ms. La Grua) for the San Diego County Child Protective Services (CPS), an agency of the California Department of Social Services and California's juvenile court, and to a psychologist (Dr. Murphy) appointed by CPS.[1] In both of these statements the appellant denied any sexual activity with his daughter. He did say, however, that after taking his wife to a bingo game earlier in the evening of 6 October 1988, he had returned home alone and saw a teenage boy in front of the house. Upon entering the house he sensed that someone had just left. When he went upstairs he found his daughter in his and his wife's bedroom, and he told her to pull her pants down and turn around. He then ran the back of his hand between her legs to see if she was moist because, to him, this would indicate if she had been having sexual intercourse.

In addressing the appellant's first assignment of error, we find that the appellant's statements to Ms. La Grua and Dr. Murphy were not subject to any privilege and that neither Ms. La Grua nor Dr. Murphy was required to advise the appellant of either his Fifth Amendment or Article 31(b), 10 U.S.C. § 831(b) rights. Consequently, the military judge did not err in admitting these statements. Even if we had found error in the admission of these statements, however, it would be harmless under the facts of this case since we agree with the military judge that the statements had little or no relevance to the issues before the court and were not considered adverse to the appellant.

As to subdivision A of the appellant's first assignment of error, we note that the privilege initially claimed by Ms. La Grua and Dr. Murphy applies equally to the daughter's statements to them as well as to those of the appellant because the California statute on which the privilege is based [Cal.Evid.Code § 1040(b) (West 1966)] concerns the confidentiality of information either contained in the records of public social services agencies [Cal.Welf. & Inst.Code § 10850 (West 1980)] or received as part of any juvenile court proceeding or matter [Cal.Welf. & Inst.Code § 827 (West Supp.1990)]. The daughter's statements are as much a part of the information in those records as are the appellant's. The appellant has not argued that the privilege claimed by Ms. La Grua and Dr. Murphy should also have barred the admission of his daughter's statements to them. The appellant does assert, however, that the military judge should have applied the criteria of *In re Hampers*, 651 F.2d 19 (1st Cir.1981), to his interpretation of the fourth exception to the general rule against claims of privilege in the Military Rules of Evidence (Mil.R.Evid.).[2] In response to this argument, the Government asserts that the military judge implicitly applied the threshold question from *Hampers* in finding that the California statute establishing the privilege can be read to allow disclosure and

---

1. These statements by the appellant to the two CPS representatives are the subject of the appellant's first assignment of error:

    THE MILITARY JUDGE ERRED IN ADMITTING STATEMENTS MADE BY APPELLANT TO MELINDA LA GRUA AND DR. RAYMOND MURPHY.

    A. *The Military Judge erred by failing to recognize the privileged nature of the communication between appellant and Child Protective Services' agents.*
    B. *The Military Judge erred by admitting appellant's statements to Melinda La Grua and Dr. Raymond Murphy when he was not advised of his rights under the Fifth Amendment.*
    C. *The Military Judge erred by admitting appellant's statements to Melinda La Grua and Dr. Raymond Murphy when appellant*

    *was not advised of his rights under Article 31(b) of the Uniform Code of Military Justice.*

2. A person may not claim a privilege with respect to any matter except as required by or provided for in:

    • • • • •

    (4) The principles of common law generally recognized in the trial of criminal cases in the United States district courts pursuant to rule 501 of the Federal Rules of Evidence insofar as the application of such principles in trials by courts-martial is practicable and not contrary to or inconsistent with the code, these rules, or this Manual.
    Mil.R.Evid. 501(a), Manual for Courts–Martial, United States, 1984.

then using that exception to determine that the privilege should not apply in this case.

We have been unable to find any prior reported decision applying Mil.R.Evid. 501(a)(4) to a similar claim of a privilege derived entirely from a state statute. Before embarking on such uncharted waters, we note that the privilege in issue here belongs to public social service agencies of the State of California, not the appellant. Even if the military judge's failure to recognize the privilege was erroneous, the person against whom the evidence is offered has no grounds to object if that person is not the holder of the privilege. 8 J. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2196 (McNaughton rev. ed. 1961).[3] The appellant may have standing to assert the privilege in regard to his own communications to the holder of the privilege, but the appellant does not have standing to assert the privilege in regard to the statements of his daughter.

## II

The appellant asserts four other assignments of error. Three of these address purported errors by the military judge in applying three different exceptions to the hearsay rule to out-of-court statements by the appellant's daughter (S–K) to seven different witnesses called by the Government. In the sequence in which the victim made these statements, the testimony of the first two witnesses (one of the victim's junior high school teachers and one of the victim's girlfriends) was admitted as excited utterances under Mil.R.Evid. 803(2) and is the subject of the appellant's second assignment of error. The testimony of the third witness (the school counselor who talked to S–K shortly after S–K's initial disclosure to her teacher and her girlfriend) was admitted as a statement for the purpose of medical diagnosis or treatment under Mil.R.Evid. 803(4) and is part of the appellant's third assignment of error. The testimony of the fourth witness (the same NIS agent who had interviewed the appellant) was admitted under the residual hearsay exception in Mil.R.Evid. 803(24) as a statement having circumstantial guarantees of trustworthiness and is the subject of the appellant's fourth assignment of error. The testimony of the remaining three witnesses (the same CPS social worker and psychologist who interviewed the appellant and a family support counselor for a support or therapy group S–K subsequently attended) was admitted as statements for the purposes of medical diagnosis or treatment under Mil.R.Evid. 803(4) and is also the subject of the appellant's third assignment of error. The appellant's fifth and last assignment of error is premised on the theory that, if the second, third, and fourth assignments of error are granted by this Court, the appellant's incriminating statement to the NIS agent is uncorroborated and should have been excluded at trial.

The only other evidence offered by the Government and admitted at trial includes the inconclusive results of a physical examination of S–K by a pediatrician specializing in child sexual abuse cases and the testimony of a second psychologist who testified about "child sexual abuse accommodation syndrome." The trial counsel also called S–K, but she refused to answer any questions concerning the allegations she had initially made about her father.[4]

3. The Court of Military Appeals has said that Wigmore's position "suffers from inflexibility" when applied in situations where "the public policy behind a rule of evidence can be effectuated only by enforcing the rule." *United States v. Moore,* 14 U.S.C.M.A. 635, 640–41, 34 C.M.R. 415, 420–21 (1964). Although reaching a contrary conclusion in *Moore,* the Court was examining the compelled testimony of a wife who did not want to testify against her husband who was accused of assaulting her. That aspect of military evidence is now specifically addressed in Mil.R.Evid. 504 and involves considerations that are not in issue in the present case.

4. During the pretrial investigation, S–K testified under oath that the sworn statement she had given to the NIS agent, detailing the allegations she had made about her father, was not true. Except to say that she had made these allegations because she was angry about restrictions that had been placed on her having older girlfriends, she declined to answer any more questions. This evidence was admitted at trial as Defense Exhibit B. In another out-of-court statement, S–K also told the NIS agent who had originally interviewed her that her initial statement was not true, but when questioned further, about her father's admission, for example, S–K

## III

■ Of the last four assignments of error, we shall initially address the assertion that the military judge erred in admitting S–K's statements to Ms. La Grua, Dr. Murphy, and the family support counselor (Ms. Daugherty) as statements for the purposes of medical diagnosis and treatment. Ms. La Grua was the first of these three to talk to S–K, and this conversation occurred on 10 October while S–K was staying at a CPS temporary shelter. At the outset, Ms. La Grua explained her role in the system, including her preparation of a report for a California juvenile court judge who would decide if S–K should continue in CPS custody. Ms. La Grua also told S–K that she was there to help children, to make sure that they are safe, not afraid, and receive help. In the ensuing conversation, S–K did not describe specific acts but did say that the molestation had begun when she was 11 and that it usually occurred in the evenings when her mother was out playing bingo. S–K also said that she had been afraid to say anything about the molestation before, but she had just gotten so tired of it that she finally spoke out. As part of Ms. La Grua's responsibilities, she referred S–K to Dr. Murphy for a psychological evaluation and to Daughters United, a treatment and support group for adolescent girls who have been molested by a relative. Ms. La Grua testified that one of the purposes of the psychological evaluation was to identify whether treatment is needed and, if needed, the type and the frequency of the treatment. She also testified that, although the examining psychologist is not permitted to treat the child, the evaluation is used by treating therapists.

Dr. Murphy interviewed S–K on 14 November 1988 following his appointment by the juvenile court. When Dr. Murphy asked S–K why she was there to see him, she said she was there because of what her dad had done and her family needed help. Dr. Murphy then explained to S–K that the Department of Social Services had requested an evaluation to better understand the family and to provide treatment. He also explained that he would not be the treatment provider, but he would make recommendations regarding her treatment and the treatment of the family. When Dr. Murphy asked if S–K could talk about the sexual abuse, S–K indicated she would prefer not to, but she would answer questions.[5] Dr. Murphy then asked about various types of sexual contact, and S–K indicated that fondling, oral copulation, and sexual intercourse had occurred since she was 11 years old.

Ms. Daugherty is a family support counselor working in the counseling component of a residential home for children operated for CPS. She stated that she conducted an intake interview with S–K at the home on 7 November 1988 to determine if S–K was an appropriate participant for the group, Daughters and Sons United, and to identify S–K's current emotional state.[6] At the beginning of the interview, Ms. Daugherty explained the purpose of the group and what happens during group sessions. In response to specific questions during the interview, S–K indicated that over the past year and a half her father had fondled her above and below the waist and that fellatio had occurred. S–K did not indicate, however, that sexual intercourse had occurred. When asked if she was experiencing problems in school, S–K said she was having difficulty concentrating, that she would become sad and cry for no reason, and that she experienced fright and feelings of helplessness when she would recall the moles-

would only say that she didn't want her father to go to jail or to be punished.

5. Each of the witnesses who testified to discussions of specific acts of molestation with S–K indicated that S–K would answer specific questions as to what did or did not happen, but she preferred not to talk about the specific acts. With one exception, when S–K spoke to the group therapist (Ms. Daugherty) and failed to indicate that sexual intercourse had occurred, the acts affirmed by S–K were fondling, oral copulation, and sexual intercourse.

6. Ms. Daugherty also testified that the purpose of the group is to provide peer support for children that have been sexually molested by a family member and that she is a therapist in the group to help the children deal with their emotions and any problems that they were encountering.

tation. Ms. Daugherty also testified that she does not normally appear in court hearings.

The medical diagnosis or treatment exception to the hearsay rule has been used in numerous instances to admit out-of-court statements made to people who were not medical doctors. These cases have included social workers,[7] psychologists,[8] and psychotherapists[9] such as Ms. La Grua, Dr. Murphy, and Ms. Daugherty. In addition, their employment or other contractual relationship to CPS or to some other child welfare agency is not determinative[10] except as it may bear on either the purpose of the conversation in which the statement is made or the purpose of the declarant in making the statement. That is, the statement to be admitted must have been made for the purposes of medical diagnosis or treatment and the declarant must have made the statement with some expectation of receiving the benefit of a medical diagnosis or medical treatment. *United States v. Deland*, 22 M.J. 70 (C.M.A.), *cert. denied*, 479 U.S. 856, 107 S.Ct. 196, 93 L.Ed.2d 128 (1986).

In this case the military judge found that the test for applying the medical diagnosis or treatment exception under Mil.R.Evid. 803(4) had been met in regard to S–K's statements to Ms. La Grua, Dr. Murphy, and Ms. Daugherty. Record at 273. We agree. In each instance S–K was initially advised that one of the primary purposes, if not the only purpose, of the ensuing conversation was either to provide help to her and her family in dealing with the situation S–K had complained of or at least to identify and recommend to the supervising agency ways in which that help could or should be provided. It is particularly clear in S–K's explanation to Dr. Murphy that she understood the purpose of the interview was to provide help to her and her family. It cannot be reasonably expected nor should it be considered a re-quirement that a 12–year–old should articulate the precise nature of the treatment she is seeking.

## IV

Since we have determined that no error was committed in the admission of S–K's out-of-court statements to Ms. La Grua, Dr. Murphy, and Ms. Daugherty, we will address the appellant's last assignment of error. From the testimony of these three witnesses alone, we find there is sufficient corroboration of the appellant's confession of having had sexual intercourse with his daughter and his admission that he had done sexual things to his daughter, and we deny the appellant's last assignment of error. We will, however, briefly address the remaining assignments of error.

## V

As to the admission of the school counselor's testimony, the counselor did not provide any explanation of her role in providing a medical diagnosis or medical treatment other than to tell S–K that she would be referred to social services. S–K's explanation of why she had not said anything earlier was that she was afraid but came forward now because she was "tired of it", and she repeated that several times during the conversation. Record at 223–24. This would indicate that S–K's motive in talking to the school counselor was not as focused on receiving help in a medical or treatment sense as it may have been on getting help simply to get her father to stop molesting her. We do not believe this meets the test articulated in *Deland* for admissibility under Mil.R.Evid. 803(4). The school counselor may have had more information about her conversation with S–K that might have supported the military judge's ruling, but the trial counsel's theory in introducing this evidence was that S–K's statements were excited utterances.

7. *United States v. Cottriel*, 21 M.J. 535 (N.M.C.M. R.1985); *see also United States v. Williamson*, 26 M.J. 115 (C.M.A.1988) (*rev'd on other grounds*).

8. *United States v. White*, 25 M.J. 50 (C.M.A. 1987).

9. *United States v. Welch*, 25 M.J. 23 (C.M.A. 1987).

10. *Id.; United States v. Dean*, 31 M.J. 196 (C.M.A.1990).

The military judge did not rule that S–K's statements to her school counselor were not excited utterances, but he may have been reluctant to admit the evidence on that basis since the counselor testified that S–K appeared calm when she was called in to see the counselor and did not begin to cry until she started to describe the molestation. Nevertheless, we find the school counselor's testimony to be cumulative of other evidence we have already concluded was admissible, and any error in the admission of S–K's statements to her counselor was not materially prejudicial to the appellant.

## VI

■ As to the admission of S–K's statements to her girlfriend and the note S–K gave her teacher[11] as excited utterances, the evidence offered at trial indicates that these statements and the note were S–K's initial disclosure of the incidents on which the charges in this case are based. The note and these statements were made by S–K shortly after noon on 7 October 1988, the day after the offense stated in Charge I occurred. S–K approached her 5th and 6th period teacher just prior to the beginning of class (about 1215) and said she wanted to talk to her. The teacher testified that she has known S–K since the beginning of the school year, that S–K is usually effervescent, very studious and very pleasant, and that they are friendly and talk occasionally before and after class. On the 7th, however, the teacher noticed that something was obviously wrong with S–K. She had tears in her eyes, was emotionally upset, very melancholy, very sad, and unlike the way she normally appeared. When the teacher asked S–K if she wanted to talk before class, she said she wanted to wait until the class break. While the teacher was walking around the room during the first session of the class, she noticed S–K weeping at her desk while another girl was trying to comfort her. Although the teacher had never seen S–K behave like that before, she did nothing at that time. When she passed by a second time, however, S–K slipped her a note specifically addressed to her, which said "My dad touches me". The teacher immediately took the note to the school principal. When the teacher returned to the classroom, it was time for the class break, and she sent S–K on to the school office to talk to a counselor.

The girlfriend (S) who was comforting S–K during class was also called as a witness by the Government. She testified that about noontime she noticed S–K crying so hard at her desk that the desk top was wet. She asked S–K what was wrong, and S–K said that her dad molested her, that he would come home from bingo early and tell her to go to the room or else she would get a spanking, and that he would start molesting her. S said that she had known S–K since the first of the school year, that they were friends, and that she had only seen S–K cry at school once before.

In a decision with many factual parallels to the present case, Judge Cox, writing the majority opinion for a split court, articulated three requirements for admitting out-of-court statements as excited utterances under Mil.R.Evid. 803(2). First, the statement must be spontaneous, excited, or impulsive rather than the product of reflection and deliberation; second, the event prompting the utterance must be startling; and, third, the declarant must be under the stress of excitement caused by the event. *United States v. Arnold*, 25 M.J. 129, 132 (C.M.A.1987), *cert. denied*, 484 U.S. 1060, 108 S.Ct. 1015, 98 L.Ed.2d 980 (1988).[12] In

---

**11.** The military judge did not find any of S–K's verbal statements to her teacher to be relevant or material and stated that he did not consider them. Record at 274. The teacher only spoke briefly with S–K after taking S–K's note to the school principal.

**12.** Chief Judge Everett disagreed with Judge Cox about the application of the third requirement, not in the articulation of the criteria, and emphasized the importance of distinguishing between the excitement generated by the telling of the event and the excitement caused by the event, itself. *Arnold* at 135 (Everett, C.J. dissenting). In the present case, the military judge may have noticed this distinction when he declined to rely on Mil.R.Evid. 803(2) in admitting the testimony of the school counselor.

*Arnold,* as in the present case, the declarant was a 12–year–old girl who made the admitted statements the day after a sexual assault by her father. (The victim in *Arnold* sought out her school counselor at the beginning of school but did not talk to the counselor until about two hours later, while here the initial contact was about four hours after school started.) Both sought out a school official, both were described as being very emotional, both exhibited a demeanor very different from their usual demeanor, both were crying and very upset (although Chief Judge Everett notes that the victim in *Arnold* began crying during the interview, not before it), and both spontaneously spoke (or wrote) of improper sexual conduct by their fathers (albeit in different words). Although the victim in *Arnold* referred to only one episode, we do not believe the event the night before was any less traumatic and stressful for S–K merely because it was not the first such episode she had experienced.

Even though approximately 18 hours had elapsed before these disclosures were made, we note that despite S–K's initial willingness to wait until a more convenient time to talk to her teacher, she was not able to do so and instead, while crying at her desk, passed a note to her teacher in the middle of class. S–K's conversation with S also occurred at the same time, during class, while S–K was in the same emotional state.

▮▮▮▮ The theory behind the admissibility of excited utterances is that the person who makes such exclamations under the stress caused by the event lacks the opportunity to reflect and fabricate an untruthful statement. *United States v. LeMere,* 22 M.J. 61 (C.M.A.1986); *United States v. Jones,* 30 M.J. 127 (C.M.A.1990). The lapse of any particular period of time, however, is not the focus of the rule. A determination that "the declarant was under the stress of excitement caused by the event" vice making a reflective, deliberate statement is, on the other hand, an explicit

and fundamental part of the criteria for applying Mil.R.Evid. 803(2). We are convinced by the facts and circumstances of this case, as summarized above, that S–K's statements to her girlfriend and the note she gave to her teacher were excited, not reflective, utterances that S–K made under the stress and excitement caused by the traumatic event the night before. Accordingly, we find no error in the military judge's similar conclusion.

## VII

▮▮▮▮ Turning to the appellant's fourth assignment of error, we note that the military judge made his ruling on the admissibility of S–K's out-of-court statement to NIS under Mil.R.Evid. 803(24) without the benefit of *Idaho v. Wright,* 497 U.S. ——, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990).[13] At no time during the trial did the defense mention the appellant's right to confront S–K, and the military judge found that the defense had not raised any issue concerning the appellant's right under the Fifth Amendment to confront the declarant. The military judge also determined that the statement was evidence of a material fact, that it was more probative than any other evidence reasonably available, and that the interests of justice were best served by the admission of the statement. Record at 273. We agree and only address whether S–K's statement has sufficient "equivalent circumstantial guarantees of trustworthiness".

In his determination that the statement had sufficient indicia of reliability, the military judge specifically mentioned the following eight factors concerning the statement: (1) it was made "fresh on the heels of the excited utterance"; (2) it was consistent with the excited utterance; (3) it was made under oath; (4) it was detailed; (5) there was no evidence of a motive to fabricate; (6) it was consistent with the appellant's admission to NIS; (7) it was consistent with the results of the physical examination of S–K; and, (8) it was made voluntarily. In *Wright,* however, the Su-

---

**13.** The rule announced in *Wright* will apply retroactively to all cases pending on direct review or not yet final. *Griffith v. Kentucky,* 479

U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987); *United States v. Avila,* 27 M.J. 62 (C.M.A.1988).

preme Court limited what could be considered guarantees of trustworthiness to "those that surround the making of the statement and that render the declarant particularly worthy of belief." 110 S.Ct. at 3148. The Court considered the use of corroborating evidence to support the admission of "a presumptively unreliable statement" to be bootstrapping on the trustworthiness of other evidence and not a factor relating to whether the declarant was particularly likely to be telling the truth when the statement was made. *Id.* at 3150.

Consequently, of the eight factors the military judge enumerated here, only four might be considered relevant guarantees of trustworthiness under *Wright.* These are that the statement was sworn, that it was detailed, that it was voluntary, and that there was no evidence of a motive to fabricate. As to the last, the military judge made his ruling before S–K's testimony at the Article 32 investigation was offered and admitted in evidence. Before declining to answer any further questions, S–K told the investigating officer that she had fabricated her NIS statement because of restrictions placed on her having older girlfriends. Defense Exhibit B. We do not believe the remaining three factors surrounding S–K's statement to NIS are sufficient guarantees of trustworthiness to overcome the presumptive unreliability of out-of-court statements not admissible under a firmly rooted hearsay exception, as outlined in *Wright.* As we have pointed out, however, we think there was ample evidence admissible on other grounds to corroborate the appellant's admissions and to support his conviction beyond a reasonable doubt. Any error in the admission of S–K's statement to NIS was harmless and did not materially prejudice any of the appellant's substantial rights.

The findings of guilty and the sentence as approved on review below are affirmed.

Chief Judge WILLEVER and Senior Judge STRICKLAND concur.