124

**UNITED STATES, Appellee,**

v.

**Tyrone MILLER, Staff Sergeant U.S. Marine Corps, Appellant.**

No. 66,320.
NMCM 89 2570.

U.S. Court of Military Appeals.

Argued Dec. 4, 1991.

Sept. 30, 1992.

For Appellant: *Lieutenant Mary Anne Razim, JAGC, USNR* (argued); *Lieutenant Tamara A. Massengale, JAGC, USNR* (on brief); *Lieutenant Nanette M. DeRenzi, JAGC, USNR.*

For Appellee: *Colonel T.G. Hess, USMC* (argued); *Commander Thomas W. Osborne, JAGC, USN* and *Lieutenant Kirk A. Ludwig, JAGC, USNR* (on brief); *Commander W.F. Shields, JAGC, USN.*

*Opinion of the Court*

COX, Judge:

This appeal concerns admissibility of statements made by appellant to two witnesses: a San Diego County, California, child-protective-service investigator and a psychologist appointed by the San Diego County Juvenile Court.[1] Before taking the statements, neither witness advised appellant of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831, or *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Under the unique circumstances of this case, we hold that, even if the military judge erred in receiving the evidence, appellant could not have been prejudiced. *Arizona v. Fulminante*, —— U.S. ——, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); Art. 59(a), UCMJ, 10 USC § 859(a).

I

Contrary to his pleas, appellant was convicted of raping, sodomizing, and committing an indecent act upon his 12–year–old daughter, S–K, at Camp Pendleton, California.[2] The allegations against appellant

---

1. The granted issue is:

   WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY FAILING TO SUPPRESS STATEMENTS MADE BY APPELLANT TO TWO CHILD PROTECTIVE SERVICE AGENTS WHEN THOSE STATEMENTS WERE EITHER CONFIDENTIAL UNDER CALIFORNIA STATUTE OR WERE UNWARNED IN VIOLATION OF ARTICLE 31(b) AND THE FIFTH AMENDMENT.

2. *See* Arts. 120, 125, and 134, Uniform Code of Military Justice, 10 USC §§ 920, 925, and 934,

came to light on October 7, 1988, when S–K informed a teacher and a friend at school that appellant had sexually molested her the previous night.

The Court of Military Review summarized this evidence as follows:

> As to the admission of S–K's statements to her girlfriend and the note S–K gave her teacher [*] as excited utterances, the evidence offered at trial indicates that these statements and the note were S–K's initial disclosure of the incidents on which the charges in this case are based. The note and these statements were made by S–K shortly after noon on 7 October 1988, the day after the offense stated in Charge I [rape] occurred. S–K approached her 5th and 6th period teacher just prior to the beginning of class (about 1215) and said she wanted to talk to her. The teacher testified that she has known S–K since the beginning of the school year, that S–K is usually effervescent, very studious and very pleasant, and that they are friendly and talk occasionally before and after class. On the 7th, however, the teacher noticed that something was obviously wrong with S–K. She had tears in her eyes, was emotionally upset, very melancholy, very sad, and unlike the way she normally appeared. When the teacher asked S–K if she wanted to talk before class, she said she wanted to wait until the class break. While the teacher was walking around the room during the first session of the class, she noticed S–K weeping at her desk while another girl was trying to comfort her. Although the teacher had never seen S–K behave like that before, she did nothing at that time. When she

passed by a second time, however, S–K slipped her a note specifically addressed to her, which said "My dad touches me." The teacher immediately took the note to the school principal. When the teacher returned to the classroom, it was time for the class break, and she sent S–K on to the school office to talk to a counselor.

> The girlfriend (S) who was comforting S–K during class was also called as a witness by the Government. She testified that about noontime she noticed S–K crying so hard at her desk that the desk top was wet. She asked S–K what was wrong, and S–K said that her dad molested her, that he would come home from bingo early and tell her to go to the room or else she would get a spanking, and that he would start molesting her. S said that she had known S–K since the first of the school year, that they were friends, and that she had only seen S–K cry at school once before.

> ---

> [*] The military judge did not find any of S–K's verbal statements to her teacher to be relevant or material and stated that he did not consider them. Record at 274. The teacher only spoke briefly with S–K after taking S–K's note to the school principal.

32 MJ at 850.

The military judge received in evidence the note and S–K's statements to S as excited utterances. Mil.R.Evid. 803(2), Manual for Courts–Martial, United States, 1984. The appearance and demeanor of the victim, as described by the teacher and S, are, of course, not hearsay.[3]

In the evening of October 7, S–K was interviewed by Naval Investigative Service (NIS) Agent Janet Moller and a San Diego

---

respectively. On February 15, 1989, appellant was sentenced by the military judge to a dishonorable discharge, confinement for 96 months, partial forfeitures, and reduction to E–1. Initially, the convening authority approved the sentence as adjudged. In a supplementary action, effective May 30, 1990, he suspended the unexecuted confinement for 4 years, with substantial limitations on appellant's proximity to and contact with his wife or daughter. The Court of Military Review affirmed the findings and sentence as modified. 32 MJ 843 (1991).

3. The testimony of the school counselor was also received in evidence, wherein the counselor related the lengthy history of sexual abuse described by S–K on October 7. However, the Court of Military Review rejected the evidentiary basis upon which the military judge received this testimony, deeming the evidence inadmissible. Nevertheless, that court concluded that the testimony was "cumulative" to "other evidence" properly admitted, so its admission was harmless to appellant. 32 MJ at 849–50.

County Child Protective Services (CPS) social worker. S–K's extensive written and oral statements to these women were received in evidence as residual and medical hearsay. Mil.R.Evid. 803(24) and 803(4).[4]

Shortly after midnight on the morning of October 8, 1988, appellant was interrogated by Agent Moller and NIS Agent Shelly Amsden at the NIS office. He was advised of his rights under Article 31, which he waived. According to the agents, he stated: "I admit that I have done sexual things to my daughter, but there's not a living soul on earth that I will give the details to." *See* 32 MJ at 845. A short time later, however, he admitted that S–K's "allegations regarding the night of October 6th, which included intercourse, were true and that that [intercourse] had happened." He denied, however, sodomizing or fondling S–K.

On October 10, S–K made extensive revelations to Melinda La Grua, a CPS social worker, during an interview conducted at a temporary shelter for children taken into custody by CPS. On November 7, S–K made extensive revelations to Linda Daugherty, a family support counselor, during an intake interview at a residential home for children. On November 14, S–K made extensive revelations to Dr. Raymond Murphy, a private psychologist appointed by the San Diego County Juvenile Court to evaluate her. All of these statements were received as statements for the purposes of medical diagnosis and treatment. *See* Mil. R.Evid. 803(4); *White v. Illinois*, — U.S. ——, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992).

None of the foregoing evidence—either appellant's confession to NIS or S–K's statement to the various witnesses or any of the descriptions or diagnoses of S–K— are presently in issue before this Court.

What is in issue are two of appellant's unwarned statements: The first was made to Melinda La Grua, one of the CPS social workers who had interviewed S–K. This statement occurred on October 13, 1988, in a corridor at the San Diego County Juvenile Court, where a custody hearing regarding S–K was about to be conducted. Appellant was shackled and under military escort at the time of the interview. Ms. La Grua's intent was to explain the proceedings to appellant and to interview him as was her duty. According to her testimony:

> I was interviewing him out of court and I was outside in an open area, so I wasn't really trying to get a whole lot of information from him. I more or less wanted to give him information about why his daughter was in custody and where she was at because as far as I understood it, he didn't know what was going on with her and he seemed concerned and I—he had the right to know.

On direct examination by trial counsel, she testified as follows:

Q. Did you recommend that any criminal action be taken in his case?

A. No, I did not.

Q. Do you ever make such recommendations?

A. We do cross reporting like if it's a—in this particular case, no. We do cross reporting. We fill out forms and we send it to the police in whatever jurisdiction.

Q. For information purposes?

A. Right.

Q. Did you ever talk about your interview with the accused to NIS?

A. Yes, I did.

Q. And when was that?

A. Probably within a few days of having my interview with him. I don't recall the day.

\* \* \*

Q. What explanation or statement, if any, did the accused make to you when you interviewed him?

A. He wanted to tell me what had gone on. I think I said, "So what had gone on

---

4. Appellant did not object to this evidence on the grounds of confrontation. In any event, the prosecution called S–K as a witness. She re- fused to answer any of the prosecution's questions, and the defense declined to question her.

that night?" the last night that he had been in the residence with his family, and he gave me an explanation of what had gone on.

Q. And what did he explain to you?
A. He said that he had left to go to bingo at like an NCO club, a noncommissioned—it was down the street from his house, from where he lived—and he had gone with his wife and shortly after arriving there, he left because he owed some money for a water purifier or some kind of water purifier to another man....

He was unable to locate the friend, and in going back to the bingo, he went by his house again and he saw a teenage boy—I think he said he was around 17 years old—in front of his house, and he said he recognized him. He had seen him around before, but he didn't—I asked him if he knew the name and he said no he didn't, and he told this boy something to the effect, "Don't hang around my house when I am not here or my car is not here and when my wife's not home," and then the—the kid took off he said, the kid took off, and then he went inside the house, and apparently it's a two story home.

He said that there was a back door that was open and there was some beads—I guess it must be like hanging beads—he said they were moving. He said he could tell somebody had been—had gone, you know, moved past them because they were still kind of moving, and that he went upstairs and found his daughter in their bedroom, the parents bedroom, and she—I think she was in—I don't know if she was lying on the bed or watching TV or something like that, and that he told her to pull her pants down and turn around and he ran the back of his hand between her legs. He told me he was trying to see if she was moist, and I asked him if she was moist, what did that mean, and he said that meant that she was having sex, and then he said he turned her—he walked away and went over to the sink and washed his hands and wiped them on a towel, and

while he was at the sink, he told her to pull her pants back up, but then he changed it a little bit and said he had hit her, he hit her twice. He said, "I hit her twice on the bottom, but I didn't beat her." And I don't know exactly how everything left—and then he said he just left.

And I don't get any kind of—there were no statements made to one or the other. I asked him if his hand was indeed moist, I mean, was he getting the result that he was looking for, and he said no.

Q. And was that the only explanation that you received for what happened?
A. Right, yes, it is.

Appellant's rendition on October 13 surprised Ms. La Grua because she knew S–K's version of the events, and she also possessed appellant's October 8 confession to NIS.

The other statement in issue was made by appellant to Dr. Raymond Murphy, the court-appointed psychologist who had also examined S–K. Appellant was brought to Dr. Murphy's office by military escort. Dr. Murphy explained to appellant that his

entire family was being evaluated for purposes of developing a treatment plan and issuing reunification order plans through the Department of Social Services.

Appellant provided Dr. Murphy an explanation similar to the one he had given Ms. La Grua. As with Ms. La Grua, appellant specifically denied all allegations by S–K. Due to this "denial of any wrongdoing," Dr. Murphy concluded appellant would not be "amenable to treatment within the standard treatment for families of incest which would be Parents United and associated treatments." Dr. Murphy recommended "that there should be no contact as long as he was denying it."

II

Appellant moved to exclude his statements to Ms. La Grua and Dr. Murphy as violations of his Article 31(b) or Fifth Amendment rights against self-incrimination. The military judge, however, found

the statements admissible. He concluded that Ms. La Grua and Dr. Murphy had no duty to advise appellant of these rights because they were not acting as law enforcement officers; rather, they were pursuing an independent, civil investigation on behalf of the juvenile court; their investigations did not merge with the NIS investigation; and the juvenile court process was not oriented toward eliciting evidence for trial.

However, the military judge, who was also the factfinder, announced:

> Indeed, the court finds the interview as described to have little or no relevancy to the issues before the court. I rule in regard to the motion as to the points raised in the motion. As to a self-imposed or raised objection by the military judge as to relevancy, I've already made comments in that regard; suffice it to say that I would not and do not consider the statements to be adverse. This is in regard to the motion to suppress the statements by Staff Sergeant Miller to Melinda La Grua and to [sic] Staff Sergeant Miller to Doctor Raymond Murphy, 13 October '88 and 15 November 1988.

The Court of Military Review agreed with the judge that neither Ms. La Grua nor Dr. Murphy was required to advise appellant of his Fifth Amendment or Article 31(b) rights. Further, that court concluded that, even if admission of the statements was error, it was harmless because "the statements had little or no relevance to the issues before the court and were not considered adverse to the appellant." 32 MJ at 846.

Given the other evidence in the case, and given the military judge's view of the statements taken by Ms. La Grua and Dr. Murphy, we agree that appellant was not prejudiced. *Arizona v. Fulminante,* — U.S. ——, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Therefore, we affirm.[5]

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges CRAWFORD and GIERKE concur.

Judge WISS and Senior Judge EVERETT did not participate.

---

**5.** In this posture, anything substantive we might say about admissibility of these statements could be dismissed as mere *obiter dicta.* Accordingly, we observe only that these facts illustrate many of the concepts we addressed in *United States v. Moreno,* 36 MJ 107 (CMA 1992). [The case is quite different from *United States v. Moore,* 32 MJ 56 (CMA 1991), where the accused on his own sought out the assistance of a psychiatric nurse for his child-abuse-related depression.] We note specifically Ms. La Grua's futile effort at the court-martial to exercise her qualified California privilege not to reveal the contents of her interview with appellant and the prosecution's conversion of that putatively confidential interview to a criminal context. *Cf. United States v. Moreno,* 36 MJ at 112. As noted in *Moreno,* the quantum and degree of information exchange and coordination between civil and criminal authorities can dramatically affect the admissibility conclusion.

Further, this record intimates at the potential dilemma and pressures that can be placed on servicemembers to confess—under an implicit or explicit threat to remove a child from the servicemember's family. Here, for example, because appellant did not confess, he was not deemed worthy of being placed in a program aimed at eventual reunification with S–K. How these options are presented to a servicemember can weigh heavily on questions of admission-voluntariness.

This is an area where trial defense counsel can provide their clients with a real service by making sure that they understand the risks involved and by getting all the parties talking to each other. · A social services program aimed at salvaging a family is not going to be effective if the military authorities exploit those efforts for prosecutorial purposes.