UNITED STATES, Appellee,

v.

Cleveland C. PITTMAN, Specialist
U.S. Army, Appellant.

No. 67,520.
CM 9002707.

U.S. Court of Military Appeals.

Argued Nov. 30, 1992.

Decided April 19, 1993.

For Appellant: *Captain Victor A. Tall* (argued); *Lieutenant Colonel James H. Weise, Captain Robin N. Swope, Captain Kurt J. Mayer* (on brief); *Captain Michael W. Meier.*

For Appellee: *Lieutenant Colonel Joseph A. Russelburg* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel Daniel J. Dell'Orto, Major Edith M. Rob* (on brief); *Captain Samuel J. Smith, Jr.*

*Opinion of the Court*

COX, Judge:

The granted issue questions admissibility of two pretrial statements made by appellant.[1] Appellant was convicted, contrary to his pleas, of one specification of assault consummated by a battery upon a child under the age of 16 (committed at Hanau, Federal Republic of Germany) and one

---

1. The issue, as framed by appellant, is: WHETHER THE MILITARY JUDGE ERRED BY ADMITTING CERTAIN STATEMENTS MADE BY APPELLANT TO SERGEANT DAVIS AND MR. CORLIN AS THESE STATE- MENTS WERE MADE AS PART OF AN INTERROGATION WITHOUT APPELLANT'S ATTORNEY BEING PRESENT AFTER APPELLANT HAD PREVIOUSLY BEEN ADVISED OF HIS RIGHTS AND HAD INVOKED

specification of fraudulent enlistment, in violation of Articles 128 and 83, Uniform Code of Military Justice, 10 USC §§ 928 and 883, respectively.[2] Both pretrial statements in issue relate to the assault specification, and both were the subject of a preliminary motion to suppress evidence by the defense.

## Facts

The assault offense came to light on May 25, 1990, when appellant's 9–year–old stepson, C, appeared at school—after several days absence—bearing scabbed-over welts and abrasions on his face and much of his body. Upon being questioned by school authorities, he reported having fallen out of a tree. As the wounds did not seem to be consistent with such an incident and suspecting child abuse, the school authorities summoned the military police. After observing the wounds, Military Police Investigator (MPI) Horace King transported C to a military medical dispensary. Because the school principal was unsuccessful in contacting appellant or his wife by telephone, a military police patrol unit was dispatched to their quarters to notify them.

The Pittmans arrived at the dispensary while the medical examination of C was in progress. The examining physician confirmed child abuse.[3] After the examination, MPI King approached appellant and his wife in the waiting room. Recognizing that "child abuse ... fell under the purview of CID" (Criminal Investigation Command) and having already summoned the on-duty agent, MPI King merely identified himself, "requested their ID cards," and informed "both of them that they were under apprehension for suspected child abuse." He did not question either of them.

The prosecution's case at the court-martial consisted essentially of appellant's two pretrial statements, which are the subject of this appeal, and the graphic physical evidence of the abuse on C, see n. 3, supra. In addition, it was revealed through defense cross-examination of MPI King that King asked C how he got the injuries, and C responded

> to the effect that they beat him—referring to—what I [King] would assume was that he was referring to his parents.

The defense contention was that Mrs. Pittman exclusively had assaulted C, not appellant.[4] In that regard, C testified as a defense witness. He denied that appellant had beaten him and blamed it on his mother. C conceded, however, that he told the CID agent on the night the crime was discovered that appellant was the perpetrator, but his trial testimony was that his

HIS RIGHT TO SILENCE AND TO CONSULT AN ATTORNEY.

2. On October 2, 1990, a general court-martial composed of officers and enlisted members tried and sentenced appellant to a bad-conduct discharge, confinement for 1 year, and total forfeitures. The convening authority mitigated the forfeitures to $300 pay per month for 6 months but otherwise approved the sentence. The Court of Military Review affirmed the findings and sentence as approved by the convening authority without opinion.

3. As Dr. Richard Nichols, the examining physician, later testified in appellant's court-martial:
    These [referring to diagrams depicting C's injuries] were linear looped shaped abrasions—contusions and abrasions of the skin [pointing on the diagram],—which were darker colored than the surrounding skin,—somewhat raised in area,—and on some of the loops there were little scabs.
    *   *   *
    [T]hese are the little loops as I saw them [pointing to shaded areas on the projected diagram ... ],—and they involve the back, the arm, and the face.... These other spots were scabs from previous abrasions. They appeared to be a little older than the loops. In Dr. Nichols' view, the wounds "were recent—because they had already had scabs over them,—so they were a few days old." He agreed that a prosecution exhibit (an electrical extension cord found with appellant's typewriter) was the type of object that "could have caused" the injuries. Dr. Nichols "recommended that the child be removed from the presence of whoever did it ....[b]ecause ... [he] felt that anybody that could allow themselves to lose such control in disciplining a child might do further harm." He considered the injuries "severe" and opined that they had been inflicted with "considerable force." He termed it a "flogging."

4. Mrs. Pittman, as a civilian, was of course not subject to court-martial; and the likelihood of German prosecution, versus visa cancellation, seems remote.

mother had instructed him to blame appellant.[5]

■ The first pretrial statement in issue came about in the following manner: After appellant was apprehended, he was taken to the CID office. There he was advised of his rights by the investigating CID agent; he declined to make a statement and exercised his right to counsel.[6] He was thereafter released to the custody of his company commander.

Sergeant Joseph R. Davis was dispatched from appellant's company to pick up appellant at the CID office and to deliver him to the company. Sergeant Davis was appellant's section leader, but he was not informed why appellant was at the CID office. Davis took appellant home to retrieve some clothes and then brought him to the barracks. Davis had no conversation with appellant on that occasion.

The next day, appellant called Sergeant Davis at his home. Davis had been detailed to escort appellant any time he needed to leave the post. Appellant informed Davis "that he needed to go home and get some clothes." Davis, who was off-duty and not in uniform, went into the unit and escorted appellant to his home, where he picked up some clothes "and talked to his wife for about [an] hour."

On the way back to the barracks, Davis, "as a concerned section leader," asked appellant "what was going on, and, you know, should I know about it." Appellant explained "that he had problems with [C]— as far as stealing, and he had handled the situation as best he could. . . ." Appellant went on to say "that he did it. . . . That he hit [C]."

Davis had not advised appellant of any rights, and he did not inform anyone of appellant's statement. Asked why not, he reasoned:

— Well, I don't know, ma'am,—because I—as a section leader, you know, I'm looking out for the welfare of my soldiers,—so,—I didn't report it to nobody. And, like you said,—it was already—the evidence in question may have already been spoken for. That's why I didn't report it. I don't know.

Beyond their official duty relationship, Davis described appellant as "a friend." This friendship included off-duty socializing with appellant and his family and the mutual sharing of confidences.

After receiving the evidence on the motion, the military judge made the following findings of fact and rulings regarding Davis' testimony:

One, that Sergeant Davis on 26 May 1990 was the accused's immediate supervisor;

Two, Sergeant Davis was detailed by his first sergeant to act as the accused's primary escort;

Three, Sergeant Davis was a close friend of the accused;

Four, on 26 May Sergeant Davis was asked by the accused to escort the accused to his home;

Five, on 26 May 1990 Sergeant Davis did not know what offense the accused was suspected of committing;

Six, Sergeant Davis asked the accused one question, "What's going on?" or "What's happening?" or words to that effect;

Seven, Sergeant Davis' question was motivated out of curiosity, and was not an attempt at interrogation;

5. As reflected in the summarized Article 32, Uniform Code of Military Justice, 10 USC § 832, investigation report, both C and Mrs. Pittman testified at that hearing that Mrs. Pittman had inflicted the injuries to C. Attached to the record of that proceeding are copies of what purport to be the sworn, written statements of C and Mrs. Pittman, dated May 25, 1990, indicating that appellant was the actual assailant. These documents were not introduced in evidence.

6. The information regarding the attempted questioning of appellant at the CID office is drawn from the Article 32 investigating officer's report (allied papers) and is not of decisional significance to this opinion. *See* text, *infra; see also United States v. Bethea,* 22 USCMA 223, 46 CMR 223 (1973).

Therefore, the motion to suppress statements made by Specialist Pittman to Sergeant Davis is denied.

*Analysis*

There is no contention in this case, and there could not be, that the conversation between Sergeant Davis and appellant amounted to a "custodial interrogation." Therefore, the cases cited by appellant— *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990)—are inapposite. Both of these cases involve custodial assertions of rights in the first place *and* an attempt by law enforcement officials to re-initiate *interrogation of the accused still in custody.* We are cited no authority, and we are not aware of any, for the proposition that a custodial assertion of rights under the Fifth Amendment remains effective, *i.e.* creates an exclusionary rule, for post-release conversations with non-law enforcement people.

Likewise, there is no contention that a "critical phase" of the court-martial process had occurred, such that a Sixth Amendment right to counsel had ripened. *See Kirby v. Illinois*, 406 U.S. 682, 688, 92 S.Ct. 1877–1881, 32 L.Ed.2d 411 (1972) (plurality opinion); *United States v. Wattenbarger*, 21 MJ 41 (CMA 1985), *cert. denied,* 477 U.S. 904, 106 S.Ct. 3272, 91 L.Ed.2d 563 (1986).

That leaves appellant to rely on the protections of Article 31(b), UCMJ, 10 USC § 831(b), which provides:

No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

Our historical interpretation of Article 31(b) was thoroughly chronicled in *United States v. Duga*, 10 MJ 206 (CMA 1981). Tracing back as far as *United States v. Wilson and Harvey*, 2 USCMA 248, 8 CMR 48 (1953), we noted that application of this provision to any given conversation depended upon the nature and circumstances of the conversation. Not all communications by persons "subject to" the Code constitute an interrogation or amount to requesting a statement from an accused or suspect.

Thus, as both parties to this appeal recognize, the question is whether Sergeant Davis was interrogating appellant or whether, "[b]ecause of the effect of superior rank or official position ..., the mere asking of ... [the] question ... [was] the equivalent of a command." *United States v. Duga*, 10 MJ at 209, quoting from *United States v. Gibson*, 3 USCMA 746, 752, 14 CMR 164, 170 (1954). *See also United States v. Loukas*, 29 MJ 385 (CMA 1990).[7]

■ The military judge and the trial attorneys understood this distinction as well; and the nature of Sergeant Davis' question was comprehensively litigated. On this record, we are satisfied that the conclusions of the military judge are supported in fact and are correct in law. As a matter of law, we agree that appellant's statement to Sergeant Davis was neither a product of interrogation nor a request for a statement from an accused or suspect, within the meaning of Article 31(b). *See* Art. 67(c), UCMJ, 10 USC § 867(c)(1989). Accordingly, we hold that the admission to Sergeant Davis was properly received in evidence.

---

7. In his footnote to this Court's opinion in *United States v. Loukas*, 29 MJ 385, 389 (CMA 1990), then-Judge Sullivan stated:

This Court has implicitly held that a superior in the immediate chain of command of the suspect subordinate will normally be presumed to be acting in a command disciplinary function. *United States v. Seay*, 1 MJ 201 (CMA 1975). *See United States v. Doyle*, 9 USCMA 302, 310, 26 CMR 82, 90 (1958); *cf. United States v. Hopkins*, 7 USCMA 519, 521–22, 22 CMR 309, 311–12 (1957). However, this presumption is not so broad or inflexible as to preclude a limited exception where clearly justified. *See United States v. Beck*, 15

■ This conclusion renders resolution of admissibility of the second pretrial statement unnecessary. Even if the second statement turns out to be inadmissible, we are satisfied that appellant was not prejudiced. This is so because we are satisfied that appellant's candid admission to his friend and confidant had much more probative impact than his statement to a complete stranger—a civilian social worker employed by the military (who, arguably, was in a position to exert some leverage over appellant). *See generally United States v. Moreno,* 36 MJ 107 (CMA 1992); *United States v. Miller,* 36 MJ 124 (CMA 1992). Coupled with the other evidence of record, receipt of the first admission rendered receipt of the second admission harmless beyond a reasonable doubt. Art. 59(a), UCMJ, 10 USC § 859(a); *see United States v. Remai,* 19 MJ 229 (CMA 1985).

The decision of the United States Army Court of Military Review is affirmed.[8]

Judges CRAWFORD, GIERKE, and WISS concur.

SULLIVAN, Chief Judge (concurring in the result):

I concur in the result reached by the majority opinion; however, I must write separately to resolve these issues.

First, I find nothing in the record of trial which established a factual or legal basis for appellant's claim that he was denied his Fifth Amendment right to counsel. In this regard, appellant suggests to this Court that he exercised his Fifth Amendment right to counsel during the initial questioning at the military police station. Final Brief at 2. He refers this Court to allied papers which consist of a military police blotter submitted by trial counsel to defense counsel in response to a defense motion for discovery. However, there is no indication that the military police blotter or any evidence pertaining to appellant's purported request for counsel was before the military judge for a factual or legal determination. *See United States v. Bethea,* 22 USCMA 223, 46 CMR 223 (1973). Moreover, neither the defense motion to suppress, the Government's motion to deny, nor any argument at trial raised this legal issue. Therefore, the defense failed to make a motion to suppress evidence based on a violation of appellant's assertion of his Fifth Amendment right to counsel; consequently, such a failure constitutes a waiver of that right. *See United States v. Baker,* 30 MJ 262, 270 (CMA 1990); Mil.R.Evid. 103(a)(1), Manual for Courts–Martial, United States, 1984; RCM 905(e), Manual, *supra* (Change 4).

Second, turning to the question relating to Article 31, Uniform Code of Military Justice, 10 USC § 831, I agree that the military judge did not legally err in denying appellant's motion to suppress his state-

USCMA 333, 338–39, 35 CMR 305, 310–11 (1965).

**8.** After several Article 39(a), UCMJ, 10 USC § 839(a), sessions were conducted in this case, the convening authority withdrew the original charge and its specification, on which appellant had been arraigned. After the withdrawal, additional charges were preferred and investigated. *See* Art. 32. Subsequently, the original charge, two additional charges, and their respective specifications were referred to the court-martial convened by the same court-martial order as before. At the Article 39(a) session following the second referral, all parties treated the interim as a mere recess in the proceedings. Appellant was arraigned on all charges then before the court-martial, and no objections to the withdrawal and second referral were lodged. After the second referral, a defense motion was made regarding one of the additional charges, but none of the defense motions

relating to the original charge were renewed. As the court-martial proceeded through findings and sentence, the rulings made during the earlier Article 39(a) sessions were executed without objection by the parties.

The correctness of this procedure, and the effect and vitality of the record of trial prior to the withdrawal of the original charge, are not before this Court, and we intimate no opinion thereon. *See, e.g.,* RCM 604, Manual for Courts–Martial, United States, 1984. Under the circumstances of this case, we are confident that the court-martial which adjudicated the charges was imbued with full jurisdiction and that no error accrued which "materially prejudice[d] the substantial rights of the accused." Art. 59(a), UCMJ, 10 USC § 859(a). The procedures followed here, however, demonstrate some unintended pitfalls of "ad hoc" jurisdiction, to which military judges, counsel, and the authorities responsible for monitoring the Manual for Courts–Martial should carefully attend.

ments made to Sergeant Davis. *United States v. Loukas*, 29 MJ 385 (CMA 1990); *United States v. Beck*, 15 USCMA 333, 35 CMR 305 (1965).

Finally, consistent with my dissent in *United States v. Moreno*, 36 MJ 107, 122 (CMA 1992), I conclude that Mr. Corlin "was not acting as a private citizen or as a disinterested state official but as a" federal civilian social worker "cooperating with military law enforcement agents in accordance with" Army regulations. Para. 3–24, Army Regulation 608–18, Army Family Advocacy Program (October 19, 1987). Therefore, I would hold that the military judge's ruling to deny the motion to suppress appellant's statements to Mr. Corlin was incorrect as a matter of law. Nevertheless, I too would affirm on the basis of harmless error. *United States v. Loukas, supra* at 390.