**UNITED STATES, Appellee,**

v.

**Claudius L. MITCHELL, Aviation Ordnanceman Second Class, U.S. Navy, Appellant.**

No. 98–0248.
Crim.App. No. 96–0587.

U.S. Court of Appeals for
the Armed Forces.

Argued Dec. 2, 1998.

Decided Aug. 12, 1999.

SULLIVAN, J., delivered the opinion of the Court in which COX, C.J., and GIERKE and EFFRON, JJ., joined. CRAWFORD, J., filed a dissenting opinion.

For Appellant: *Lieutenant Robert Attanasio*, JAGC, USNR (argued).

For Appellee: *Lieutenant James E. Grimes*, JAGC, USNR (argued); *Colonel Kevin M. Sandkuhler*, USMC, and *Commander D.H. Myers*, JAGC, USN (on brief); *Colonel Charles Wm. Dorman*, USMC, and *Lieutenant Commander Nancy Blankenship Jones*, JAGC, USN.

Judge SULLIVAN delivered the opinion of the Court.

In January of 1995, appellant was tried by a general court-martial consisting of officer members at Naval Air Station, Jacksonville, Florida. Contrary to his pleas, he was found guilty of attempted premeditated murder; willful damage to military property; larceny; assault intentionally inflicting grievous bodily

injury;[1] and simple assault, in violation of Articles 80, 108, 121, and 128, Uniform Code of Military Justice, 10 USC §§ 880, 908, 921, and 928, respectively. On January 7, 1995, he was sentenced to a dishonorable discharge, 29 years' confinement, total forfeitures, and reduction to E–1. On February 20, 1996, the convening authority approved the adjudged sentence, but suspended confinement in excess of 20 years for a period of 20 years from the date sentence was adjudged. The Court of Criminal Appeals affirmed the approved findings and sentence in an unpublished opinion dated April 30, 1997.

This Court granted review in this case on July 30, 1998, on the following issue:

I

WHETHER THE MILITARY JUDGE ERRED BECAUSE HE DENIED APPELLANT'S MOTION TO SUPPRESS THE STATEMENT TO CHIEF GRABIEL IN VIOLATION OF APPELLANT'S CONSTITUTIONAL RIGHT TO COUNSEL.

We hold that the military judge prejudicially erred when he denied the defense motion to suppress appellant's pretrial statements to Aviation Ordnanceman Chief Grabiel and admitted them at this court-martial. *United States v. Brabant*, 29 MJ 259 (CMA 1989); *United States v. Reeves*, 20 MJ 234 (CMA 1985); *see generally Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

█ Appellant was arrested on June 4, 1994, after he allegedly shot his shipmate, Aviation Structural Mechanic (Hydraulics) First Class Darnell Johnson, USN. The parties to this trial stipulated to certain facts pertinent to a defense motion to suppress some incriminating statements made by appellant to Chief Grabiel, his leading petty officer and work supervisor, the next day during a command visit to appellant in the brig. The record of trial states:

TC: [Reading] Both counsel have agreed that at approximately 0507, 4 June 1994, Security Department, Naval Air Station, Key West, Florida, received a call reporting shots fired at Barracks Enlisted Quarters 648. That QM2 Robert Bruchsaler, USN, attached to Security Department received a dispatcher call to proceed to BEQ 648. After securing the crime scene QM2 Bruchsaler was directed to advise the accused, who was sitting in the rear seat of a patrol car, his Article 31(b) and counsel rights.

That QM2 Bruchsaler sat in the front seat of the pa-patrol car with the accused in the rear seat and established that the accused was coherent and proceeded to read the accused his Article 31(b) UCMJ and counsel rights from a rights warning card.

QM2 Bruchsaler stated that the accused understood his rights and requested counsel. *That prior to their meeting with the accused on 5 June 1994, Commander Malinak, Lieutenant Gage, and AOC Grabiel were aware of the fact that the accused was advised on 4 June of his Article 31(b) and counsel rights by Petty Officer Bruchsaler and that he had declined to make a statement and requested counsel.*

That all questioning by any security personnel ceased after the accused declined to make a statement and requested a lawyer. The Security Department, NAS, Key West, turned the case over to the Naval Criminal Investigative Service, Key West, the same day relaying that the accused request for—relaying the accused request for a lawyer and desire not to make a statement. NCIS did not reread the accused rights nor ask any questions of the accused.

TC: The following day, 5 June 1994, QM2 Bruchsaler was assigned to guard the accused while the accused command made preparations for the accused return to the Waterfront Brig, Naval Air Station, Jacksonville, Florida. *On 5 June 1994, around 1400, Lieutenant Jeff Gage, United States Navy, Legal Officer of VFA–87; Commander Gregory E. Malinak, spelled M–A–L–I–N–A–K, United States Navy, Executive Officer of VFA–87; and AOC Lawrence Grabiel, United States Navy,*

---

1. This offense was dismissed shortly after findings were announced. (R. 431).

*Leading Chief Petty Officer of VFA–87, made contact with the accused for the purpose of providing a command health and welfare visit.*

That Commander Malinak had been informed that Petty Officer Mitchell was refusing to eat even though base security had been offering food. For the purpose of ensuring that the air transportation of the accused from Key West to the Waterfront Brig, NAS, Jacksonville, was successfully completed and for Lieutenant Gage to provide the accused notification of pretrial confinement rights and review process. That the—which is agreed by both parties to admit the actual notification as a stipulation of fact.

MJ: I'll make it a part of the stipulation. Has this stipulation of fact been marked as Appellate Exhibit III?

TC: Yes, sir.

MJ: Thank you.

TC: That the executive officer of the accused command requested AOC Grabiel to be present as the accused's leading chief petty officer and to provide support and a command visit.

Lieutenant Gage read verbatim from the notification of pretrial confinement review process work sheet to the accused in the presence of Commander Malinak and AOC Grabiel. The accused acknowledged his rights in writing by requesting a military lawyer for his magistrate hearing and to personally appear before the magistrate. That neither the executive officer or Lieutenant Gage inquired into any facts surrounding the alleged shooting incident nor had they explicitly directed or even talked about that to AOC Grabiel for him to make any such inquiry. After Lieutenant Gage informed the accused of his pretrial confinement rights, he and Commander Malinak left the room. *AOC Grabiel talked with the accused inquiring whether he needed anything like cigarettes or anything to eat.*

TC: *After returning with cigarettes and a milk shake, AOC Grabiel asked the accused without informing the accused of Article 31(b) or counsel rights, "Was it worth it?"* That the accused did not initiate any questions regarding the shooting incident. In response to this question the accused responded, *"The way I was raised, it was an eye for an eye. He left me in the alley,"* or words to that effect.

Chief Grabiel was not acting on behalf of the Security Department, NAS, Key West—

* * *

TC: The next one [sentence] is that the accused when with Chief Grabiel did not initiate any questions regarding the shooting incident.

* * *

TC: The last stipulation is that the accused was flown from Naval Air Station, Key West, to the Waterfront Brig, NAS, JAX, and that they departed at 2200 that Sunday, 5 June.

No evidence was presented at trial to suggest that appellant and Chief Grabiel had any personal contact or friendship outside of military duties. Chief Grabiel was called and testified that his motivation to ask the questions was "out of personal curiosity" about a member of his unit. After the command health and welfare visit, Naval Criminal Investigative Service (NCIS) Agent Lederberg contacted Chief Grabiel, as appellant's supervisor, to question him about appellant's character. Chief Grabiel voluntarily told NCIS that he spoke with appellant and he signed a statement on June 9 attesting to appellant's incriminating answers. In this statement, Chief Grabiel wrote in his own handwriting, "PO2 Mitchell was read his rights by Lt. Gage prior to my questioning him."

At trial, defense counsel filed a written motion to suppress those incriminating statements made by appellant in response to Chief Grabiel's questions alleging a violation of his Fifth Amendment rights to the presence of counsel during custodial interrogation. The military judge denied the motion in part and granted it in part. He said:

At the time of the accused's statement Chief Grabiel was a chief petty officer on active duty in the United States Navy and

in the accused's direct chain of command; and

At the time the chief had no law enforcement duties other than normal duties of every chief petty officer to ensure good order and discipline; and

MJ: Three, that on 6 June 1994 when he spoke to the accused the chief was not acting for or at the direction of any law enforcement agent;

Four, that at the time the chief asked the question "Was it worth it," he was motivated solely out of personal curiosity;

Five, however, I'm not satisfied with regard to the questions concerning the "gun" that the chief was strictly motivated out of strictly personal curiosity. I think that was professional and very much akin to law enforcement. Therefore, the references to the gun are suppressed as I told you before references—the answer to the question "Was it worth it?" is not suppressed.

Chief Grabiel later testified on the merits to appellant's statements. Appellant also testified to the defense of accident and voluntary intoxication. Specifically, he said that he did not intend to injure Petty Officer Johnson; rather he intended to shoot the gun in the air. When asked to explain his "eye for an eye" statement, appellant testified:

Petty Officer Johnson really scared me in the alley, and it was my intent to scare him just as bad as he had scared me. I wanted to also bring up the fact that what he had done in the alley, because they had also told me that I couldn't say anything or ask any questions concerning the case.

---

Appellant's complaint at trial and on this appeal is that his pretrial statement to Chief Grabiel was "obtained in violation of the bright line rule annunciated by the Supreme Court in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)." Final Brief at 3. He further avers that the prosecution failed to show this violation of his right to have counsel at his interrogation was harmless beyond a reasonable doubt. The Government disagrees, and, relying on the decisions of this Court in *United States v. Pittman*, 36 MJ 404 (1993) and *United States v. Jones*, 24 MJ 367 (1987), argues that Chief Grabiel's personal inquiries were not interrogation and, therefore, not violative of *Edwards*. Answer to Final Brief at 6. During oral argument, the Government additionally contended that any error under *Edwards* was harmless beyond a reasonable doubt in view of the overwhelming evidence of appellant's guilt.

Our starting point in resolving the granted issue is the case law of this Court applying *Edwards v. Arizona, supra*, in the military justice system.[2] *United States v. Brabant*, 29 MJ 259; *United States v. Goodson*, 22 MJ 22 (CMA 1986); *United States v. Reeves*, 20 MJ 234; *see also United States v. Faisca*, 46 MJ 276 (1997); *United States v. Vaughters*, 44 MJ 377 (1996) (applies *Edwards* in break-in-custody context). These decisions are entirely consistent with the President's adoption of this Supreme Court precedent as reflected in Mil.R.Evid. 305(d)(1), (e)(1), and (f). *Faisca, supra* at 278 n. 3. In this light, the particular question before us is whether Chief Grabiel's questioning of appellant in custody, after invocation of his rights to counsel, violated *Edwards v. Arizona, supra*.

**2.** The granted issue in this case asks whether appellant was denied his "constitutional right to counsel." The Supreme Court has held that a servicemember has no Sixth Amendment right to counsel at a summary court-martial, which it characterized as a disciplinary proceeding outside the scope of that Amendment. *See Middendorf v. Henry*, 425 U.S. 25, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976). Moreover, more recently in *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the Supreme

Court assumed, but did not decide, whether *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the Fifth Amendment right-to-counsel cases are applicable in trials by general courts-martial. *Id.* at 457, 86 S.Ct. 1602. The parties to this appeal do not dispute applicability of these Fifth Amendment Supreme Court decisions to appellant's case and neither do we. *See United States v. Goodson*, 22 MJ 22 (CMA 1986); *United States v. Tempia*, 16 USCMA 629, 37 CMR 249 (1967).

The Supreme Court in *Edwards*, 451 U.S. at 484–85, 101 S.Ct. 1880, established a rule concerning custodial interrogations. It said:

We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communications, exchanges, or conversation with the police.

In *Arizona v. Roberson*, 486 U.S. 675, 687, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), it further recognized that, in applying *Edwards*, "we attach no significance to the fact that the officer who conducted the second interrogation did not know that respondent had made a request for counsel." Still later, in *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), that Court applied *Edwards* where a county police officer unknowingly interrogated a suspect after he had previously invoked his rights to federal investigators. *See also Illinois v. Perkins*, 496 U.S. 292, 300, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) (Brennan, J., concurring in the judgment).

The question before us today concerns the scope of *Edwards* as applied in a particularly military context. In the past, we have often been asked to decide whether questioning by command authorities constitutes interrogation for the purpose of *Miranda*, *Edwards*, or Article 31, UCMJ, 10 USC § 831. *See* Mil.R.Evid. 305(d)(1)(A), Manual for Courts–Martial, United States (1994 edition) [3] (right to counsel applies when "the interrogation is conducted by a person subject to the code who is required to give warnings under Article 31. . . ."). Common to these decisions is recognition of the fact that "care must be exercised to prevent the creation of situations where the subordinate's sense of loyalty, trust, and confidence in his leader obscures his legal rights under the Constitution and the Uniform Code of Military Justice." *Brabant*, 29 MJ at 263; *see United States v. Beck*, 15 USCMA 333, 339, 35 CMR 305, 311 (1965). Analogous issues arise in the civilian context with respect to questioning of sus-

pects in custody by various governmental non-police actors. *See United States v. D.F.*, 63 F.3d 671, 680–84 (7th Cir.1995) (and cases cited therein), reaffirmed, 115 F.3d 413, 420 (7th Cir.1997).

The Government's basic argument in this case is that Chief Grabiel's questioning of appellant was not police interrogation as prohibited in *Miranda* and *Edwards*. *See generally* 1 W. LaFave and J. Israel, *Criminal Procedure* § 6.10(c) at 542 (1984) ("*Miranda* does not inevitably apply whenever questions are asked in a custodial setting by a government employee"); *United States v. Eide*, 875 F.2d 1429, 1434 (9th Cir.1989); *see also United States v. Borchardt*, 809 F.2d 1115, 1117 n. 4 (5th Cir.1987). There is no per se rule for delineating when non-police government questioning comes within *Miranda*; rather the courts have tended to view each case in light of the totality of its circumstances to determine whether impermissive coercion has occurred or continued. *See United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987) (questioning by prison physician's assistant motivated by personal "curiosity" is not interrogation by police); *cf. United States v. Webb*, 755 F.2d 382, 389 (5th Cir. 1985) (questioning by prison classification officer not normally attendant to classification procedure is interrogation). We have taken a similar approach where the government questioner is a representative of command. *See United States v. Brabant* and *United States v. Reeves*, both *supra*; *see also Commonwealth v. McGrath*, 508 Pa. 250, 495 A.2d 517, 525–26 (1985).

Turning initially to the federal civilian cases noted above, we consider appellant's case quite similar to *United States v. Webb*, *supra*, where a violation of *Edwards* was determined to have occurred. There a soldier suspected of the murder of his son was advised by FBI agents of his rights under *Miranda* and asserted his right to counsel. Those agents ceased questioning the suspect and brought him to the El Paso County Jail for purposes of custody. "[T]he classification officer on duty [Simmons] allowed Webb to make a telephone call and then gave him

---

**3.** This version was in effect at the time of trial. The current version is unchanged.

something to eat and drink." The Court then noted:

> According to Simmons, in order to determine where in the jail population to place Webb, Simmons asked Webb, "[W]hat kind of shit did you get yourself into?" According to Simmons, Webb's surprising reply was: "I murdered my son and buried him in the desert."

*Id.* at 386, 86 S.Ct. 1602.

In *Webb,* the Government maintained that Officer Simmons' inquiry was simple administrative questioning "attendant to custody" which was exempt from the Supreme "Court's definition of interrogation" in *Edwards.* The Fifth Circuit rejected this claim and said:

> The record, however, does not support this position. First, it is undisputed that Simmons knew that Webb had been charged with murder on a federal reservation. Second, the FBI agent that took Webb to the jail testified that he did not inform the classification officer of Webb's prior suicide threat. Third, another classification officer testified that it is not normal procedure to ask a defendant the charge against him since that information was on the booking card. Finally, Simmons testified that he saw his own role as one of helping the FBI's investigation in whatever way he could. Given the facts of this case, we are inescapably led to the conclusion that Simmons' question of Webb was not a question normally attendant to custody such that it was not "interrogation." To the contrary, Simmons expressly questioned Webb, and that questioning falls within the Supreme Court's definition of interrogation. Moreover, even if no express questioning was involved, the entire episode, including the reference to a Christian burial, was reasonably likely to elicit an incriminating response, and Simmons should have known that such a response was reasonably likely. This Court holds that Simmons' questioning constituted a police-initiated interrogation. Consequently, Webb's jailhouse statements were obtained in violation of *Edwards,* and should not have been admitted at Webb's trial.

755 F.2d at 389 (footnote omitted).

Likewise, Chief Grabiel was appellant's work supervisor and military superior who was visiting him in a military jail as part of an official command visitation team which included two commissioned officers. In addition, he was present when those officers advised appellant of his pretrial confinement rights, including his right to counsel, and he exercised that right. Third, he was also aware of the offenses that appellant was suspected of committing and that he had previously exercised his right to counsel to military police. Fourth, Chief Grabiel admitted that he was not a friend of appellant but provided him a milkshake and cigarettes as a part of his command visitation duties. Finally, he admitted that he had command disciplinary responsibility for both appellant and the alleged victim and that his inquiries were partially motivated by his prior disciplinary pronouncements on gun possession within his command. Under the rationale of *Webb, Edwards* was violated.

Our own case law even more clearly supports our conclusion that *Edwards* was violated in appellant's case. First, like *Brabant* and *Reeves,* this was a case where a command representative questioned a member of his command while in confinement in a military jail. This circumstance was not present in the two Article 31 warning cases primarily relied on by the Government on this appeal. *See Pittman,* 36 MJ at 406 (released by Criminal Investigation Command into custody of company commander); *Jones,* 24 MJ at 368 (under company escort in unit orderly room). Second, unlike *Pittman* and *Jones,* the command representative deliberately questioned his subordinate knowing he was suspected of a particular offense and that he had exercised his rights to counsel on two occasions with respect to it. Finally, the record shows the absence of any personal relationship between appellant and Chief Grabiel, and that "military formality was maintained" at all times during this command visit in accordance with its purpose. *See Brabant,* 29 MJ at 263. In these circumstances we conclude that, despite Chief Gra-

biel's "personal curiosity," the "'inherently compelling pressures' of the initial interrogation continued to exist for this command meeting." *Id.* at 263.

The second question raised in this case is whether this constitutional error was harmless beyond a reasonable doubt such that we need not set aside appellant's convictions on this basis. *See generally Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Chapman v. California,* 386 U.S. 18, 22–24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The Supreme Court has placed the burden on the Government "to prove beyond a reasonable doubt that" inadmissible evidence obtained from a violation of the Constitution "did not contribute to the verdict obtained." *Id.* at 24, 87 S.Ct. 824; *see Reeves, supra* at 237. It has not done so here.

In this regard, we note that appellant was charged with attempted premeditated murder and assault intentionally inflicting grievous bodily injury. He was also charged with several other offenses with specific-intent type elements. Thus, intent was a key issue in this case, and the members had to specifically find that appellant had a specific intent to injure Petty Officer Johnson. Appellant raised the defense of accident when he testified that he never intended to actually shoot Johnson, but rather, he merely planned to scare Johnson by shooting at the ceiling as Johnson opened the door. He further testified that he did not know that he had actually shot Johnson; instead he shot at the door handle to keep Johnson from coming out to attack him further. Thus, the inadmissible evidence on appellant's intent to shoot Johnson was clearly pertinent to the critical issue in this case.

Furthermore, the Government offered Chief Grabiel's testimony as a substantial part of their case-in-chief. During its closing argument, the Government repeatedly referred to appellant's statement to his chief as evidence of appellant's specific intent to kill. In fact, it characterized that statement as the best evidence of appellant's intent to kill. Specifically:

*Now, probably the biggest statement that the accused made that really shows his intent was, was when he was talking with Chief Grabiel.* Now, what's important there, this wasn't the same time all this happened. This was after he had thought about what he had just done, after he had been told that Petty Officer Johnson had been shot by him. After he knew all the facts of this, Chief Grabiel asked him "Was it worth it?" The accused responded "Where I come from it's an eye for an eye. He left me in the alley." *It shows absolutely no remorse and it shows what he planned to do, he did what he planned to so, and it shows what his motive was. He wouldn't say that if he just had an accident. That's not the kind of statement you say if you just have an accident, "it was an eye for an eye." He did a deliberate act of shooting Petty Officer Johnson. That's the only reason why he made that statement.*

(Emphasis added.)

Finally, the Government's argument on harmless error is not persuasive. It contends that the overwhelming evidence of appellant's intent to injure, otherwise admitted in this case, negated any prejudice he might have suffered from erroneous admission of his pretrial statements. It particularly notes evidence in the record that appellant drove over 50 miles to retrieve the gun; that he loaded the gun with a round in the chamber; that he did not tell anyone about his merely threatening intentions; and, according to one witness, that an unidentified voice said, "You know you're a dead man" in the hall just prior to the shooting.

For error to be found harmless beyond a reasonable doubt, an appellate court must be convinced that there was no reasonable likelihood that the erroneously admitted evidence contributed to the verdict. *United States v. Bins,* 43 MJ 79, 86–87 (1995). Here, there was other evidence in the record, including appellant's testimonial assertion of accident, which challenged the prosecution's circumstantial proof of intent and rendered it less than overwhelming. In light of the highly incriminating nature of appellant's pretrial statements, their clear undermining of his

trial testimony, and their exploitation by the prosecution, we find a reasonable likelihood of prejudice existed in this case.

The decision of the United States Navy–Marine Corps Court of Criminal Appeals is reversed. The findings of guilty and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Navy. A rehearing may be ordered.

CRAWFORD, Judge (dissenting):

Appellant testified that in the early morning hours of June 4, he went to the victim's room with the intention of pointing a loaded gun "up in front of [appellant]," so that when the victim opened his door, appellant could "cycle the bullets" from the magazine onto the floor. Mitchell testified:

Q: What the—could you please explain to the members exactly—all right, exactly what it is you planned on doing with that firearm in front of that door?

A: My plan was to walk up to the door, knock on the door, Petty Officer Johnson would answer the door, and I would cycle the bullets and tell him if he ever hit me again that was going to be him.

Q: When you just pointed down at the ground, what did you mean?

A: The bullets down on the ground. The visual effect for seeing the bullets pop out of the gun.

Q: You thought that would scare him?

A: Yes, sir, I did.

Appellant and Johnson, who were close friends, had been in a drunken brawl earlier that night, and appellant wanted Johnson to think that he should never hit appellant again because if he did, "he could be shot." He claimed that he did not know that he had loaded a bullet into the chamber and that the gun discharged accidentally. Appellant also testified that after the gun discharged, he continued to shoot at the cipher lock on Johnson's door to keep Johnson from coming out and trying to fight.

Testimony from the only other eyewitness to the shooting, Aviation Ordnanceman First Class Hill, appellant's supervisor, paints a somewhat different picture of this incident, as follows:

Q: How did—how was the gun raised up?

A: Brought up to his side like this [witness raises arm in shooting motion].

TC: May the record reflect that the witness has indicated the weapon was tilted sideways—parallel to the deck.

MJ: Very well.

Q: Did you see the gun discharge?

A: I really can't say on that. I heard it, but I can't say I saw it discharge.

Q: Okay. After you saw the accused fire the weapon, what did you do then?

A: I looked at him and you know, I asked him what—what's going on.

Q: Did he respond to you at all?

A: He turned on me and looked at me and he said, "I said you don't know me."

\* \* \*

Q: Now after he said that to you, what did you do in response to that?

A: Well, I started backing up down the hallway.

Q: Okay, by backing up where were you trying to go to?

A: Back up to the other passageway where I could go downstairs.

Q: What was the next thing that happened while you were backing up?

A: Well, as I got to the—the connecting passageway to head downstairs, just as I got through the double doors I heard some more gun shots.

This evidence alone casts enormous doubt on appellant's defense of accident. In addition, Aviation Support Equipment Technician Third Class Scruggs, who was at the barracks on security duty that night, testified that when appellant came down to the security desk and laid the gun on the counter, "he said, 'My boy did me bad' or something like that."

The Government also introduced evidence that appellant drove 29 miles from the bar where appellant and Johnson had scuffled to the house where appellant knew this gun was kept, then drove another 21 miles from that house to Johnson's barracks. Though appellant testified that he was weaving as he drove, that he was able to drive those 50

miles without incident tends to diminish his defense of voluntary intoxication. Furthermore, appellant himself brought out in his testimony that he had previously been to Level 3 alcohol treatment almost 2 years prior to this incident. Furthermore, the Government was able to counter his voluntary-intoxication defense with testimony from an expert in addiction psychology that though his blood alcohol content was high, he may have felt the effects of the alcohol to a lesser extent than would have been expected in someone with a less-developed tolerance.

In all, appellant shot seven bullets from the weapon. He had loaded all thirteen bullets that were kept with the gun. Appellant was in the service for 12 years and was "familiar with semi-automatic handguns." In fact, he testified that though he had never fired this particular weapon, he had "fired similar types of weapons."

Contrary to the majority's recital, 51 MJ at 240, the panel found appellant guilty of attempted premeditated murder, willfully damaging military property, larceny of the gun, assault with the intent to inflict grievous bodily harm[1], and simple assault on the victim's roommate[2]. Thus, the panel clearly did not believe appellant's fantastic story of how this event occurred.

Given the overwhelming case the Government presented, I would hold that even if the military judge erred by allowing appellant's statement to Chief Grabiel into evidence, such error was harmless beyond a reasonable doubt. *See Arizona v. Fulminante,* 499 U.S. 279, 306–12, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (harmless–error analysis for confession); *United States v. Remai,* 19 MJ 229 (1985) ·(*Edwards* violations are subject to harmless-error analysis).

## WAS THERE AN *EDWARDS* VIOLATION?

However, I do not believe that the military judge's denial of the defense motion to suppress appellant's statement was clearly erroneous.

Chief Grabiel's testimony at trial was that a day and a half after the shooting, he asked appellant "if it was worth it," and appellant replied, "He left me in an alley and where I come from it's an eye for an eye." Appellant explained at trial what he meant by that, as follows:

> Petty Officer Johnson really scared me in the alley, and it was my intent to scare him just as bad as he had scared me. I wanted to also bring up the fact that what he had done in the alley, because they had also told me that I couldn't say anything or ask any questions concerning the case.

The remainder of Chief Grabiel's testimony was that appellant was an exemplary worker and a man of ".flawless" military character. There is no dispute that appellant had been read his rights and invoked his right to counsel twice before Chief Grabiel spoke with him or that Chief Grabiel was aware of this fact and of the acts with which appellant was charged.

The Government used this statement in their closing argument and rebuttal as evidence of appellant's motive and intent. The defense explained it away in its closing as meaning "reciprocal treatment. In Petty Officer Mitchell's mind that was a scare for a scare. Not a shooting for a scare. In Petty Officer Mitchell's mind if it had worked out as planned that would have been an equitable trade, 'an eye for an eye.' Evenness and not escalation was his intent but not by shooting—not by shooting."

In *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court held

> that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that

---

1. This charge was subsequently dismissed as being multiplicious for findings. R. 431.

2. The panel substituted this as a lesser-included offense for the charge of assault with a means likely to inflict grievous bodily harm.

an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

(Footnote omitted.)

The Supreme Court elucidated the definition of interrogation for *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and, hence for *Edwards* purposes in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). There it was stated:

> The concern of the Court in *Miranda* was that the "interrogation environment" created by the interplay of interrogation and custody would "subjugate the individual to the will of his examiner" and thereby undermine the privilege against compulsory self-incrimination. [384 U.S.] at 457–458, 86 S.Ct. 1602. The police practices that evoked this concern included several that did not involve express questioning.... It is clear that these techniques of persuasion, no less than express questioning, were thought, in a custodial setting, to amount to interrogation.
>
> This is not to say, however, that all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation.... It is clear ... that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. "Interrogation," as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.

446 U.S. at 299–300, 100 S.Ct. 1682 (footnote omitted). In this respect, the Court noted that those "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police

should know are reasonably likely to elicit an incriminating response from the suspect" are considered "interrogation." *Id.* at 301, 100 S.Ct. 1682.

In a footnote, the Court noted that though the inquiry should focus on the suspect's view, it should not entirely exclude consideration of the intent of the police. *Id.* at 301 and n. 7, 100 S.Ct. 1682. The intent of the police "may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response." *Id.* at n. 7, 100 S.Ct. 1682.

## APPLICATION TO THE MILITARY

Applying the *Edwards* rule, the majority determines that because of the disparity in rank between Aviation Ordnance Chief Grabiel and Aviation Ordnanceman Second Class Mitchell, the "'inherently compelling pressures' of the initial interrogation continued to exist for this command meeting." 51 MJ at 240, quoting *United States v. Brabant*, 29 MJ 259, 263 (CMA 1989).

*Brabant*, a security policeman who had exercised his rights to remain silent and to counsel when he became a suspect in a larceny, was ordered by his supervisor—that is, Captain Gathright, who was also the squadron operations officer and acting commander—to come into the Captain's office at the police station just as Brabant's shift was ending. There Brabant made "spontaneous" incriminating statements. *Id.* at 260–61. This Court determined that these circumstances constituted "the functional equivalent of" an interrogation.[3] We admonished that "care must be exercised to prevent the creation of situations where the subordinate's sense of loyalty, trust, and confidence in his leader obscures his legal rights under the Constitution and the Uniform Code of Military Justice." *Id.* at 263.

As then-Judge Cox perceptively pointed out in his separate opinion, however, the Court's decision went too far when it characterized the "conversation as an interroga-

---

**3.** As then-Judge Cox observed, "It is interesting to note that appellee has never testified that he felt 'compelled' to incriminate himself." 29 MJ at 265 n. 2 (Cox, J., concurring in part and dissenting in part).

tion." *Id.* at 265 (concurring in part and dissenting in part) (If it is one, "it is the strangest one" he has ever seen as a judge.). His concerns are quite apropos here: Such an expansive and "inflexible application of" the rule could "seriously undermine the important, if not vital, relationship between a company commander and a member of his unit.... This case illustrates once again the traps, pitfalls, and obstacles placed in front of military officials trying—in good faith—to carry out the responsibilities incumbent upon them." *Id.* at 265. Judge Cox concluded that "courts can examine the conduct of officials involved and rationally determine whether it constitutes interrogation or the 'functional equivalent' thereof." *Id.* at 268.

The majority also cites *United States v. Reeves,* 20 MJ 234 (CMA 1985), in support of its holding. In that case, Reeves' company commander, Captain Kozak, questioned him at the stockade where his confinement was being processed. Captain Kozak even borrowed a rights' warning card and read Reeves his rights before questioning him. *Id.* at 235. Finding this to be clearly an interrogation, we sent the case back to the lower court for their determination of whether Reeves "initiated" the conversation when Captain Kozak showed up for a regular command visit and whether admission of the evidence was harmless error. *Id.* at 236–37.

On remand, the lower court found that the Government had failed to show that Reeves initiated the conversation or that admission of the statement was harmless error. 21 MJ 768, 769, 770 (ACMR 1985). However, the court expressly rejected the Government's request to determine that *Edwards* does not apply to military commanders, stating that "such a determination is beyond the scope of the remand in this case." *Id.* at 768. Furthermore, the court found itself "not persuaded by the facts in this case that [Reeves'] company commander was not engaged in a law enforcement function when he interrogated" Reeves. *Id.* at 769. Given this factual and procedural posture, I do not share the majority's opinion that this case is supportive of its holding.

Furthermore, we have previously found that disparity in rank or supervisory status is not dispositive on this issue. For instance, in *United States v. Loukas,* 29 MJ 385, 389 n. * (1990), we noted in a footnote: "This Court has implicitly held that a superior in the immediate chain of command of the suspect subordinate will normally be presumed to be acting in a command disciplinary function. However, this presumption is not so broad or inflexible as to preclude a limited exception where clearly justified." (Citations omitted.) Thus, it was not the rank per se which we considered important but the role which the supervisor was in when talking with the suspect or accused, and even that was not dispositive. Additionally, the Court there looked to the "circumstances of the case to determine if what occurred was an interrogation or a request for a statement." *Id.* at 390 (Cox, J., concurring).

## ARTICLE 31(b) CHALLENGES

Also, our case law on challenges based in Article 31(b) is illustrative of the inquiry we should follow here. Though one is rooted in statute and the other in constitutional proscriptions, the purposes served by Article 31 and the *Edwards* prophylactic rule are the same, and their inquiries should be as well. The distinguishing feature is that in an *Edwards* scenario, the questioning is in a custodial setting, but that can easily be accounted for in the inquiry. It should be remembered that Article 31 gave servicemembers protection that their civilian counterparts did not have until the Supreme Court decided *Miranda v. Arizona, supra. See United States v. Gibson,* 3 USCMA 746, 14 CMR 164 (1954). The *Edwards* rule is merely a "corollary" to that established by the Court in *Miranda. See Arizona v. Roberson,* 486 U.S. 675, 681, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).

In *United States v. Duga,* 10 MJ 206 (1981), we found that the test for applicability of Article 31 is "whether (1) a questioner subject to the Code was acting in an official capacity in his inquiry or only had a personal motivation; and (2) whether the person questioned perceived that the inquiry involved more than a casual conversation. Unless

both prerequisites are met, Article 31(b) does not apply." *Id.* at 210 (citing *United States v. Gibson, supra*). In that case, the Court determined that though the questioner was on security police duty when he questioned Duga, his motivation was purely personal. *Id.* at 211. Also, in that case, the Court noted that the questioner had not been tasked with questioning Duga by the investigative team, just as the military judge found here with regard to Chief Grabiel.

The Court in *Gibson,* 3 USCMA at 752, 14 CMR at 170, referred to this as the "restrictive element of officiality." To interpret the language of Article 31(b) without such a limitation would make communications within the military structure unwieldy and rigid. The Court also noted in *United States v. Dandaneau,* 5 USCMA 462, 464, 18 CMR 86, 88 (1955):

> Not every inculpatory statement made by an accused in conversation with another is inadmissible because of a failure to warn him of his rights under Article 31. The prohibition of the Article extends only to statements elicited in the course of official interrogation. It is essential, therefore, to determine whether the question asked by Captain Lucas, when he first met the accused in the squadron office, is, as a matter of law, so clearly official or so demanding of an answer by virtue of his superior rank as to fall within the interdiction of the Uniform Code.

(Citation omitted.) Because Captain Lucas had testified in that case that his motivation in conversing with Dandaneau in the squadron office was purely personal, the Court focused on Dandaneau's perception of the conversation. The Court drew an inference from "the informality of the conversation and the place it occurred" that Dandaneau "regarded the encounter as a casual meeting." *Id.* at 464–65, 18 CMR at 88–89.

In *United States v. Jones,* 24 MJ 367, 369 (1987), this Court found that "neither the fact that the sergeant previously had served as [Jones'] platoon sergeant nor that he and [Jones] were serving in the same company at the time of trial caused the sergeant's questions to be 'so "clearly official or so demand-ing of an answer by virtue of his superior rank" as to transform his personal curiosity into an official inquiry.'" Similarly, in the case at bar, Chief Grabiel's supervisory position should not be enough to transform his personal curiosity into officiality. Furthermore, Jones was in handcuffs and in the presence of his escort when he conversed with the sergeant. *Id.* at 368. Here, Mitchell was in arguably less custodial circumstances as he does not appear to have been in restraints.

Finally, in *United States v. Pittman,* 36 MJ 404 (1993), where Pittman had been questioned by his section leader who had been "detailed" as his escort, *id.* at 406, we held that the application of Article 31(b) depends upon the "nature and circumstances of the conversation. Not all communications by persons 'subject to' the Code constitute an interrogation or amount to requesting a statement from an accused or suspect." *Id.* at 407. We determined that the military judge's admission of the statement was correct based on an inquiry into whether, given the questioner's "superior rank" and "official position," the "mere" act of questioning was "equivalent to a command." *Id.,* citing *Duga, supra* at 209.

With this case law as guidance, I would look at the following factors to support a determination that there was no custodial interrogation in violation of *Edwards v. Arizona, supra,* here:

1. Chief Grabiel was Mitchell's supervisor, but so was Petty Officer Hill, whose rating is Aviation Ordnanceman First Class. Mitchell (Aviation Ordnanceman Second Class) made similarly incriminating statements to both of them, which were similarly used by the Government in their case. Both supervisors otherwise spoke highly of Mitchell. There is not a significant disparity between their ranks and appellant's, such that appellant would feel compelled to respond to either of them against his better judgment merely because of loyalty or trust. In fact, appellant testified that he had been told not to say anything and that this was an opportunity to tell his side of the story.

2. Chief Grabiel had no extraordinary investigative or disciplinary role here. The military judge—in what I consider an excessive abundance of caution—excluded another statement made to Chief Grabiel about appellant's possession of the gun on base because Chief Grabiel had previously warned his crew against bringing weapons on base. Thus, the military judge ruled that on that point the questioning served something of a professional purpose. Otherwise, Chief Grabiel's limited disciplinary functions were not implicated.

3. Along those same lines, the military judge, who had the opportunity to consider his demeanor on the witness stand, found that Chief Grabiel's question, "Was it worth it?" was "motivated solely out of personal curiosity." In fact, it may even be said that the question was in many respects rhetorical. He was speaking to appellant as a man for whom, given his testimony at trial, he clearly had great respect, and asking him what could have caused this unexpected variance in his exemplary conduct was a matter of personal interest.

4. Chief Grabiel was there fulfilling his command responsibilities. He had gotten appellant his cigarettes from his personal belongings; he bought appellant a McDonalds milkshake because his bruised jaw made eating difficult; he ensured that appellant had been read his pretrial confinement rights; and he checked on appellant's transportation back to Jacksonville. Under these circumstances, I find it hard to believe that appellant perceived this to be a custodial interrogation.

5. Chief Grabiel spoke to appellant on June 5; but he did not sign the statement regarding his conversation until June 9. The fact that Chief Grabiel testified on the motion to suppress that he did not approach the agent with this information makes it crystal clear that Chief Grabiel did not intend to gather evidence against appellant. This is also relevant in the analysis of whether he could have reasonably expected an incriminating response to his question.

6. That Chief Grabiel knew what charges might be brought against appellant is not relevant here. The majority cites this as one similar factor in its analogy to *United States v. Webb,* 755 F.2d 382, 389 (5th Cir.1985). However, there the court cited it as evidence that the prison classification officer's question was not part of his administrative duties. Here, Chief Grabiel's question could not have elicited any information not already in his possession.

Thus, I part company with the majority and would hold that the military judge did not err in admitting appellant's statement to Chief Grabiel; and that even reluctantly assuming error, I am confident it was harmless beyond a reasonable doubt.